Joseph **TREBONIK**, an individual dba Trebb Sales Specialty Co.

v.

**GROSSMAN MUSIC CORP.**

No. C 67–135.

United States District Court
N. D. Ohio, E. D.
Aug. 28, 1969.

———◆———

Robert J. Fay, Fay, Sharpe & Mulholland, Cleveland, Ohio, for plaintiff.

Donald A. Teare, Daniel J. Sammon, Albert R. Teare, Teare, Teare & Sammon, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This is an action for copyright infringement. This Court has jurisdiction by virtue of Title 28 U.S.C.A. § 1338. The plaintiff is the owner of a certificate of copyright dated March 3, 1947, and which is identified as Class I, No. 2213. The copyrighted article is called a "Chord-o-Matic." This consists of three paper wheels affixed together in their centers so that they may be rotated. The function of the Chord-o-Matic is to organize and depict the various fingerings for the chords which can be played on a guitar. The paper wheel which forms the middle of the three-wheel sandwich includes graphic illustrations of the fingering of various guitar chords arranged in a systematic manner. The outer two wheels of the three-wheel sandwich have four square windows cut into each of them through which, as the outer wheels are rotated, the various guitar fingerings can be observed. On one of the outer wheels is a "code" which gives the chord name for each of the depicted chords when they are formed at various places on the neck of the guitar. The Chord-o-Matic is sold with a two-page instruction sheet explaining its operation.

The alleged infringing work is a thirty-three page booklet entitled "How to Play Rock and Roll Moveable Chords." The authors of this work are William H. Hughes, Jr., and William Palmer. The booklet is published by the Alfred Music Company, Inc., a New York corporation. The defendant Grossman Music Corporation, is a distributor of this booklet in the Cleveland area.

The defendant has asserted a number of affirmative defenses to the plaintiff's claim of infringement. These are summarized as follows: (1) The plaintiff did not originate the matters which are the subject of similarities between the plaintiff's and defendant's work; (2) The similar matters are not copyrightable subject matter; (3) Any similarities in the two works are the result of "fair use" by Palmer and Hughes of the plaintiff's work; (4) Plaintiff's work was not used in the creation of the alleged infringing article; (5) Any similarities between the two works are neither substantial nor material and would not deprive the plaintiff of a market for his copyrighted article; (6) The alleged infringing article is in a different copyright class from the plaintiff's copyright; (7) Plaintiff's copyright would be invalid for failure to affix thereon the first date of publication, if the plaintiff's copyright were extended to cover the alleged infringing article; (8) The copyrighted work is invalid on the ground that plaintiff has dedicated the subject matter to the public use by publishing it without the year date notice; (9) The copyright is invalid because the Chord-o-Matic slide rule is defective in naming the copyright proprietor; (10) Plaintiff has no standing to sue; and (11) Plaintiff cannot enforce his copyright because he is guilty of "unclean hands" by reason of his marking on the Chord-o-Matic and its advertising, words importing that the slide rule was patented, for the purpose of deceiving the public.

The defendant has also asserted a counterclaim seeking a declaration that the allegation of infringement is unfounded, unwarranted, and unjust; and that the plaintiff has violated Title 35 U.S.C.A. § 292 by marking copies of the Chord-o-Matic with words importing that

it is patented for the purpose of deceiving the public. Defendant seeks costs, attorneys' fees, and a declaration that there is no infringement and that the plaintiff has violated Title 35 U.S.C.A. § 292.

The issues in this case may be better understood after a brief discussion of the construction and method of playing the six string guitar.

The copyrighted item relates to the playing of the six string guitar. On a guitar, the strings are tuned to the following notes of the scale, proceeding from the lowest to the highest: E, A, D, G, B, E. The lowest string is normally referred to as the sixth string, and the other strings are numbered accordingly from lowest to highest. In normal play, four to six strings are strummed together to form chords, the strumming finger normally running from the lowest to the highest string played. The fingers of the left hand depress various of the strings at different points on the neck of the guitar to form the individual notes of the chords.

At the end of the neck farthest away from the box is a bar called the nut. The strings are tied off past the nut, and the strings are suspended between the nut and the bridge, which rests on the box near the other end of the strings.

The neck of the guitar is divided into nineteen parts by small bars known as "frets" running across the width of the neck. There are thus 18 frets. Movement from one fret to another up the neck of the guitar toward the box will raise the tone of the note played by one-half step on the musical scale for each fret crossed. Thus, if the sixth string is strummed open, it will play note E. If the·string is depressed behind the first fret, it will play the note F and so forth down the neck.

Numerous chords (consisting of more than one note) can be played on the guitar, as on other musical instruments.

The major notes of the musical scale are the following: C, D, E, F, G, A, B, and C. The two C notes are one octave apart. In addition, on the musical scale there are five sharps (or flats) which are distributed between the major notes so that the entire musical scale reads as follows: C, C# – D flat, D, D# – E flat, E, F, F# – G flat, G, G# – A flat, A, A# – B flat, B, and C.

Chords may be formed based on each of these notes. The note for which each chord is named is called the root of the chord. A chord generally sounds more stable and musically stronger, i. e., shows its tonality best where the root of the chord is the lowest note sounded.

A number of different types of chords may be based upon each root. Using the note C, for example, C "major" chord may be formed from the notes C, E, and G. C "minor" chord can be formed from C, E flat and G. C "sixth" chord may be formed from C, E, G, and A. Other common chords are the seventh, minor sixth, minor seventh, augmented, and diminished.

Chords are denominated major, minor, diminished, etc., based on the intervals on the scale between the various notes of the chord. For example, in a C major chord there are four half-steps between C and E, and three half-steps between E and G, whereas on C minor chord there are three half-steps between C and E flat, and four half-steps between E flat and G.

It should be apparent that there is a large number of possible chords which can be played. Chords may be based upon each of the twelve tones in the musical scale. And for each of these twelve tones, several types of chords, e. g., major, minor, diminished, etc., may be formed.

The exact number of chords which may be fingered on a guitar is not known, but there are at least 700 or 1000 and perhaps many more than that. As a result of the large number of chords which may be fingered on a guitar, many instructional and informational books and writings have been published using various methods to simplify learning this large number of chords. The authors

of these works have used various systems to organize the chords for presentation in a comprehensive and systematic way. These works have been published both to teach the beginner and to advise the advanced player.

Both parties have introduced a large number of these instructional guitar books into evidence. Few of them attempt to depict or teach the fingering of any more than a few dozen chords. Indeed, to do so without a comprehensive system of categorizing and organizing would require a great deal of expense and space. Few, if any, books have attempted to describe all or most of the various chords. Indeed, the only significant attempts to depict, categorize, and teach a large portion of the available chords are the plaintiff's Chord-o-Matic, defendant's alleged infringing article, Manoloffs Complete Chord and Harmony Manual, and Guckert's Chords for the Tenor Banjo.

There are a number of ways in which the available guitar chords may be classified. The Court will outline a few of these below.

Chords may be classified by letter name or root. Under this system, all chords with the root of C would be placed in one category, those with the root of D in another category, etc. C minor, C sixth, C seventh, etc., would thus be grouped in the category of C chords.

Chords can be organized and classified by kind. Under such a classification, all major chords would be placed in one category, minor chords of each root in another category, sixth chords of each root in another category, etc.

Chords can be organized and classified by key. Under such a system of classification, the chords normally played under a particular key signature would be grouped together. In a composition of music in the key of C, for example, the chords most often played are C major, F major, G seventh, A minor, and C sixth. Under a classification by key,

these chords would appear under the C scale group.

Chords can be organized and classified according to their top note. Such a system of classification might be useful for guitar players who play the lead guitar. The evidence indicated that lead guitar players often use chords in which specific top notes appear. Under a top-note classification system, guitar chord formations in which the highest note played is, for example, G would all be grouped together.

Chords may be organized and classified by families. Such a system of classification is similar to the key system outlined above, the difference being that the key system would likely include a larger number of chords in each group.

Chords may also be organized and classified according to the number of strings struck in a chord. Thus, three-string chords would be placed in one group, four-string chords in another group, etc. This system is used in some of the instructional books for beginners.

Chords may also be classified according to their position on the neck of the guitar. Such a classification may be desirable because it is usually preferable to play several chords of a progression without moving the left hand more than a few frets on the neck of the guitar. Such movement is difficult to do rapidly; and, thus, chords played in the middle frets, for example, would form a useful group for classification.

Another potential system of classification, which may or may not be used in conjunction with any of the systems previously noted, classifies chords on the basis of the formation of the fingers which depress the strings to form the chords. Advanced guitarists know that a particular formation of fingers may be moved up the neck of the guitar to play successively higher chords. This system is sometimes referred to as movable chords. We will consider this system more closely later.

Each of the classifications and systems outlined above have been utilized at one

time or another in the various instruction books placed in evidence before the Court. Some of the books use combinations of these systems, but as we noted above, few of these books attempt to portray or categorize or teach any substantial number of the available guitar chords. The only significant attempts to categorize, depict and teach a large portion of the available chords are the plaintiff's Chord-o-Matic, defendant's alleged infringing article, Manoloff's Complete Chord and Harmony Manual, and Guckert's Chords for the Tenor Banjo.

The plaintiff's Chord-o-Matic organizes and portrays a substantial majority of the available guitar chords on the basis of root, kind, and movable chords. As noted above, the Chord-o-Matic consists of three paper wheels attached together at their centers. The middle wheel is slightly larger than the other two. Distributed at equal distances around its edges are the following written words: "Finger Formation I," "Finger Formation II," "Finger Formation III," "Finger Formation IV," "Finger Formation V," "Solo Chords." The outer paper wheels are opaque, and each has four windows cut out of it. Each also includes a small projection from its circumference in the shape of an arrow. The middle wheel has depicted on it approximately 24 grids. Each grid is composed of six vertical lines and seven horizontal lines. When either outer wheel is rotated, so that the projecting arrow points to one of the numbered Finger Formations, a grid appears through each window in the outer wheel. As the outer wheel is rotated so that the arrow points successively to each numbered Finger Formation and to the Solo Chords, a new group of four grids appears at each Finger Formation.

Each grid contains a group of numbers, one through four. Some grids contain more than one number "1" or more than one number "2", etc. Each number represents a finger on the left hand, number "1" being the index finger, and the other fingers numbered accordingly. The vertical lines on the grid each correspond to a string of the guitar. The string farthest to the left corresponds to the sixth string and so forth. The horizontal lines correspond to the nut and the first six frets on the guitar. A chord is played by depressing the fingers corresponding to each number in a given grid on the fret and string indicated by the lines on the grid.

Each of the four windows on both of the outer wheels is positioned slightly above a smaller window. When the projecting arrow is turned to each respective Finger Formation, a key letter appears below each grid in the smaller window. The same key letter appears in all four smaller windows at each respective Finger Formation (an exception occurs when the arrow points to the Solo Chords). Next to each of the smaller windows on the first outside wheel appears one of the following phrases: Major chord, minor chord, sixth chord, seventh chord. On the other outer wheel next to each of the smaller windows, one of the following words appears: Ninth chord, minor seventh chord, major seventh chord, minor sixth chord.

The Chord-o-Matic works as follows: Each Finger Formation reveals chords having their root on a given string of the guitar. Finger Formation I reveals chords whose root is on the sixth string. Finger Formation II reveals chords whose root is on the fifth string, etc.

The sixth string is tuned to the note E. The Chord-o-Matic, however, when turned to Finger Formation I, reveals a series of G chords. The reason for this is that the Chord-o-Matic uses chords built on the third fret of the guitar. This is possible by use of the so-called "grand barre."

The grand barre is formed by placing the index finger across all six strings of the guitar at a given fret and depressing all six strings. By depressing all six strings with the grand barre, the guitarist achieves an effect comparable to tuning all six strings up a given number of tones. In effect, the grand barre acts as the nut, raising the pitch

of each of the six strings one-half tone for each fret passed.

All chords on the Chord-o-Matic are grand barre chords and are built with the grand barre on the third fret. The grand barre is formed with the index finger, and so each grid contains a group of number "ones," all positioned on the third fret of the guitar. Because the Chord-o-Matic builds its grand barre chords on the third fret, each chord depicted thereon is three tones higher than it would be without the grand barre. All chords in Finger Formation I, for example, are G chords. Without the index finger forming the grand barre at the third fret (if the chord were instead built from the nut), E chords would be formed. With respect to the chords depicted in Finger Formation II, these are all C chords for the same reason. They are formed at the third fret by use of the grand barre. If they were formed at the nut without the grand barre, they would all be A chords.

On the rear outer wheel of the Chord-o-Matic, there is a table of chords. In the left margin vertically, the various Finger Formations are listed. Across the top margin, thirteen frets are also listed. The body of this table includes the names of the various chords which will be played when each Finger Formation is formed using the grand barre at a given fret. Such a categorization is possible because the same fingering moved up the guitar using the grand barre produces the same kind of chord with a progressively higher root.

This may be better understood through an example. Suppose a guitarist desired to play an A flat major chord somewhere near the middle of the neck on the guitar. He might wish to do this because he is required to play a series of progressive chords in rapid succession. Traveling up and down the neck of the guitar to play these chords is difficult, and most guitarists prefer to play these progressions insofar as possible in the same area on the neck of the guitar. A guitarist wishing to play an A flat major chord near the middle of the neck would refer to the table on the back of the Chord-o-Matic. From this table, he would observe that an A flat major chord can be played at the sixth fret using Finger Formation III. He would then dial Finger Formation III on the Chord-o-Matic. Finger Formation III depicts an F major chord, an F minor chord, an F sixth chord, and an F seventh chord at the various windows. If this guitarist wishes to play an A flat major chord, he would form the F major chord depicted at Finger Formation III, placing his index finger, however, on the sixth fret, and would thereby play an A flat major chord.

Alternatively, the guitarist might prefer to play a D chord having a root on the fifth string. Suppose he wanted to play a D sixth chord. He would refer to Finger Formation II, which depicts chords having their root on the fifth string. Finger Formation II shows a C sixth chord. The guitarist would refer to the table on the back of the Chord-o-Matic and learn that a chord having a root on the fifth string, i. e., Finger Formation II, can be formed where the grand barre is placed on the fifth fret. He would then finger the chord depicted as a C sixth in Finger Formation II and place his index finger on the fifth fret. He would play a D sixth chord.

The Chord-o-Matic thus organizes chords under three different systems simultaneously. It organizes chords on the basis of their roots. It also organizes them on the basis of their letter name. And, third, it organizes them as movable chords which may be fingered using the grand barre at any point on the neck of the guitar.

Before proceeding further, let us consider whether such an article may be copyrighted under the law of the United States.

The plaintiff does not assert any ownership rights in the chords depicted on the Chord-o-Matic themselves. Indeed, he has conceded that these chords are in the public domain. Plaintiff asserts, however, that his original method of organization and his depiction of these chords

on a dial-type wheel is the subject of a valid copyright.

To be copyrightable the work need only be creative or original. The plaintiff's work "need not be strikingly unique or novel as long as its contribution is more than a trivial variation." Pantone, Inc. v. A. I. Friedman, Inc., 294 F.Supp. 545 (S.D.N.Y.1968).

"'Original' in reference to a copyrighted work means that the particular work 'owes its origin' to the 'author.' No large measure of novelty is necessary. Said the Supreme Court in Baker v. Selden, 101 U.S. 99, 102–103, 25 L.Ed. 841: 'The copyright of the book, if not pirated from other works, would be valid without regard to the novelty, or want of novelty, of its subject-matter. The novelty of the art or thing described or explained has nothing to do with the validity of the copyright. * * *'

"It is clear, then, that nothing in the Constitution commands that copyrighted matter be strikingly unique or novel. * * * All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.'"

Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 at 102–103.

The test for determining copyrightability is originality, i. e., independent creation or individuality of expression, rather than novelty; and originality of even the slightest degree, even if it amounts to no more than a re-arrangement of age-old ideas, is sufficient. See Pantone, Inc. v. A. I. Friedman, Inc., *supra;* and cases cited therein at page 548.

Although the material assembled may itself be in the public domain, an arrangement may be copyrighted if the arrangement, expression, and manner of presentation are not in the public domain.

Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546 (7th Cir. 1965); See, 17 U.S.C.A. § 7.

Applying this standard, it is apparent that the Chord-o-Matic is a copyrightable work. The chords which it presents are admittedly in the public domain, but it arranges and presents these chords in an original, creative, and even novel way. No one prior to the plaintiff ever attempted to present a categorized system of available guitar chords in a quick reference system such as a wheel. In addition, no one prior to the plaintiff and his Chord-o-Matic ever attempted any substantial categorization of guitar chords based on a system of root classification, classification by letter name and kind, and classification as movable chords, all in one place. Earlier works did teach the fact that chords may be moved along the neck of the guitar by use of the grand barre. Earlier books also undertook to classify chords by root, and some undertook to classify chords by kind and by letter name. None of the earlier works, however, undertook to depict such a large number of chords or to present any comprehensive system of class classifying any substantial number of the available chords.

Certainly, elements of what appear in the Chord-o-Matic were present in many of the earlier works. No one prior to the plaintiff's Chord-o-Matic, however, actually undertook to present such a substantial number of available chords in a comprehensive system. The Chord-o-Matic is not only original and creative, but it satisfies an unexploited area of compilation. It provides a valuable cross-reference of a large number of the available chords and a source for ascertaining how to play these chords, neither of which were available in any earlier work. As such, the Chord-o-Matic is certainly entitled to copyright protection.

The defendant distributes the alleged infringing work, a book called "How to Play Rock-'n-Roll Movable Chords," published by the Alfred Music Company and written by William Palmer and William

Hughes. This is a thirty-three page book which classifies and depicts approximately 700 guitar chords. Each page includes (among other things) one grid containing numbers one through four. The grid depicts the fingering of one chord on the frets and strings of a guitar. Each page also contains a drawing of the neck of a guitar with letters indicating the root of the chord as it is played on each fret.

The book has the following organization: The first nine pages each portray a chord with its root on the sixth string. The next nine pages each portray a chord with its root on the fifth string. The next nine pages portray chords with their root on the fourth string. The last four pages portray chords using the thumb. In organizing their movable chords on the basis of roots, and in beginning with roots on the sixth string and proceeding through the fourth string, the organization of the alleged infringing work is identical to that of the plaintiff's Chord-o-Matic. Finger Formation I of the Chord-o-Matic depicts chords with their

roots on the sixth string. Finger Formations V and IV depict chords having their root on the fifth and fourth strings respectively.

The Palmer-Hughes book portrays the kinds of chords with their roots on the various strings in the following order: (1) major chords, (2) seventh chords, (3) minor chords, (4) sixth chords, (5) minor sixth chords, (6) minor seventh chords, (7) ninth chords, (8) diminished chords, and (9) major chords (more rarely used form). An exception to this order occurs in chords with the root on the forth string. The first six of these chords are portrayed in the same order, but thereafter the chords portrayed are as follows: (7) diminished chords, (8) augmented chords, (9) major seventh chords, and (10) major seventh chords (most common form).

When the order of chords as they are presented in the alleged infringing work is compared with the cords as presented in the Chord-o-Matic, the following appears:

| FIRST SIDE | MAJOR | 7th | MINOR | 6th |
|---|---|---|---|---|
| (Page Nos. from Palmer-Hughes book "How to Play Rock 'n Roll") | | | | |
| Finger Formation I | 2 | 3 | 4 | 5 |
| Finger Formation II | 11 | 12 | 13 | 14 |
| Finger Formation III | 20 | 21 | 22 | 23 |

| SECOND SIDE: | MINOR 6th | MINOR 7th | 9th | DIMIN-ISHED | MAJOR 7th |
|---|---|---|---|---|---|
| (Page Nos. from Palmer-Hughes book "How to Play Rock 'n Roll") | | | | | |
| Finger Formation I | 6 | 7 | 8 | 9 | |
| Finger Formation II | 15 | 16 | | | 18 |
| Finger Formation III | 24 | 25 | | 26 | |

(Fig. 10)

———◆———

This comparison indicates a striking similarity in the organization of the Palmer-Hughes book and the Chord-o-Matic. The defendant has pointed out that this comparison depends to some extent on the order in which one reads the

various windows of the Chord-o-Matic. In addition, the defendant has pointed out that the seventh chord portrayed on page 12 of the Palmer-Hughes book is fingered differently from the seventh chord portrayed in Finger Formation II

of the Chord-o-Matic. The plaintiff, however, has pointed out that the nomenclature used in the Palmer-Hughes book to describe each chord is identical to that used in the Chord-o-Matic. This is a striking similarity since there is a large number of descriptive terms which may be used to denote any given chord. The following chart indicates the comparative similarities in terminology between the Chord-o-Matic, the Palmer-Hughes book, and various other books which contain portrayals of the various chords.

| PX-1 CHORD-O-MATIC | PX-6 PALMER-HUGHES "HOW TO PLAY . ." | BEACON'S MAGIC CHORD CHART | PX-20 FINGER-BOARD HARMONY FOR GUITAR (RIGHTMIRE) | PX-19 CHORDS FOR GUITAR (FODEN-ROBERTS) |
|---|---|---|---|---|
| Major | X | X | – | – |
| 7th | X | Seventh | Major Seventh | – |
| Minor | X | X | – | – |
| 6th | X | Major 6th | Sixth, Major Sixth | Major 6th |
| Minor 6th | X | X | Minor Sixth | X |
| Minor 7th | X | – | Minor Seventh | X |
| 9th | X | Ninth | Ninth, Major Ninth | Ninth |
| Diminished | X | X | X | Diminished 7th |
| Major 7th | X | – | Major 7th | X |
| Augmented | X | X | X | Augmented 5th |

"X" denotes the same terminology and spelling as used in Mr. Trebonik's Chord-o-Matic.

In the summer of 1965, plaintiff attended a musical convention in Chicago. There he contacted Palmer and Hughes. Plaintiff desired to interest Palmer and Hughes in promoting his Chord-o-Matic, since he knew they were associated with the Alfred Music Company. He showed them the Chord-o-Matic and explained its operation. He also left one Chord-o-Matic with them.

The alleged infringing work, the Palmer-Hughes movable chords book, was published in the early part of 1966. The Court finds that Palmer and Hughes had access to the plaintiff's Chord-o-Matic at a time sufficiently prior to the writing and publication of their book to permit them to copy the structure and organization of the Chord-o-Matic. The Court further finds that the Palmer-Hughes book, the alleged infringing article, is the product of a deliberate, intentional and substantial copying of Chord-o-Matic and its method of organizing, presenting, and categorizing guitar chords.

In making this determination, the Court has considered the credibility of the various witnesses and has given the testimony of each its deserving weight. The Court finds that Palmer and Hughes had access to the plaintiff's Chord-o-Matic before or during the period in which they prepared the infringing article. The Court has also concluded that they deliberately copied the organization and structure of the Chord-o-Matic and utilized the plaintiff's original organizational system in their book on Rock-and-Roll chords. Although they adopted the plaintiff's method of organization and structure, they did not utilize all of the potential chords contained in the Chord-o-Matic. In addition, they added certain matter of their own, specifically, chords utilizing the thumb and a few other scattered chord formations. Nevertheless, although Palmer and Hughes did not use the entire Chord-o-Matic, and although they added some additional matter, the infringing article represents the product of substantial copying from the Chord-o-Matic, and the Court has concluded that such copying did take place.

■ On the basis of this Court's factual finding that Palmer and Hughes substantially copied the essential features of the Chord-o-Matic's arrangement and organization, the Court finds that the Palmer-Hughes book infringes on the plaintiff's copyright. Pantone, Inc. v. A. I. Friedman, Inc., *supra.*

Having determined that the Chord-o-Matic is an article subject to copyright protection, and having determined that the Palmer-Hughes book infringes on the plaintiff's copyright, the Court will now proceed to consider each of the affirmative defenses asserted in the Answer.

The defendant asserts that any copying or use made by Palmer and Hughes of the plaintiff's Chord-o-Matic comes within the doctrine of "fair use," and does not represent an infringement.

The doctrine of "fair use," although often asserted, is one of the most poorly-articulated legal principles in the area of copyright law. It is perhaps best understood through a discussion of some of the cases which have applied it.

■ G. R. Leonard and Co. v. Stack, 386 F.2d 38 (7 Cir. 1967), involved the alleged infringement of a directory of freight rates. The defendant admitted that it copied certain portions of the copyrighted work, but asserted that any copying came within the doctrine of "fair use." The Court stated:

"It is recognized that a compiler of a directory or the like may make a fair use of an existing compilation serving the same purpose if he first makes an honest, independent canvass; he merely compares and checks his own compilation with that of the copyrighted publication; and publishes the result after verifying the additional items derived from the copyrighted publication." 386 F.2d at 39.

The Court cited approvingly from an earlier case:

" * * * You must not bodily transmit the results of another's labor from his sheets to your own; but, having made an honest canvass, you may use his work for the purpose of checking and revising your own, if you will do so honestly, independently, and thoroughly, and having done so, you may publish the final result. If you use another's copyrighted directory without thorough verification, you are, to the extent that you fail to carefuly verify, guilty of the pure, unadulterated labor-saving device of copying. If you use it only for comparison, and then positively verify at the cost of your own exertion, you have not done wrong, because you have only used the copyrighted matter as a guide to the facts, which is the exact use to which the compiler has dedicated his book." 386 F.2d at 39.

Summarizing the doctrine of "fair use," the Court stated: "Even where there is some copying, that fact is not conclusive of infringement. Some copying is permitted. In addition to copying, it must be shown that this has been done to an unfair extent." 386 F.2d at 39.

Another case considering the issue of fair use is Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546 (7 Cir. 1965). In that case the defendant copied tables of computations from two pages of plaintiff's 32 page copyrighted booklet:

"The question is not whether the computations in the Hydro-Line charts were independently arrived at, but whether the Flick-Reedy expression and presentation of the computations, formulae and explanations were copied by Hydro-Line. * * *

"We see that Hydro-Line had the same purpose in compiling and publishing its material as Flick-Reedy had, and that it did not merely use the latter's work as a starting point for further development of the ideas expressed. It had no right to avail itself of Flick-Reedy's labor in rearranging and re-expressing the material, to save itself work or trouble, nor to use its bulletin to interfere seriously with Flick-Reedy's gainful use of its bulletin for prestige and trade in the cylinder market. The question of infringement is whether Hydro-Line's arrangement and expression is its own, so as to make its use fair as to Flick-Reedy." 351 F.2d at 548.

The Court concluded that Hydro-Line had not made mere fair use of the Flick-Reedy material, but that there had been substantial copying of the two pages of Flick-Reedy's bulletin. The Court noted that only two pages of the 32 page booklet had been copied. It found, however, that these were the most important pages from the standpoint of keeping the bulletin in front of potential customers, one of the chief purposes of distributing the information. The Court, therefore, found that fair use had not been made, but that infringement had occurred.

Perhaps the most recent important case on the doctrine of fair use is Time, Inc. v. Bernard Geis and Associates, 293 F.Supp. 130 (S.D.N.Y.1968). The Court summarized much of the law relating to this doctrine and extracted the following factors which a court should consider in applying it: 1) the purpose and character of the use, 2) the nature of the copyrighted work, 3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, 4) the effect of the use on the potential value of or market for the copyrighted work.

The Court then noted that fair use presupposes good faith and fair dealing. By this it is meant that the Court should consider the manner in which the defendant has gone about the business of copying, i. e., whether this copying was deliberate, in defiance of the copyright-owner, or through subterfuge.

■ Applying these factors to the present case, the Court has concluded that the Palmer-Hughes use of the plaintiff's copyrighted work greatly exceeded the amount which would justify application of the doctrine of "fair use." The plaintiff devised an original and useful system of presenting and categorizing and teaching the various chords which may be played on a guitar. By the use of his system, it is possible to portray and teach a substantial majority of the available chords in a minumum amount of space. Palmer and Hughes copied this organizational scheme into a book in which they also portray a substantial majority of the available chords (although somewhat fewer than the plaintiff's Chord-o-Matic). The plaintiff is attempting to sell his Chord-o-Matic which portrays substantially the same chords and organizational scheme as the defendant's infringing book. The market for his copyrighted book is thereby substantially affected, since another work portraying the same material in the same organizational scheme is available from the defendant. The organizational scheme of the plaintiff's Chord-o-Matic has been substantially copied. Although some of the chords portrayed in the Chord-o-Matic have not been copied into the Palmer-Hughes book, the chords which are most commonly and widely used have been copied. Both the Palmer-Hughes book and the plaintiff's Chord-o-Matic are marketed and purchased for

the same purpose, i. e., teaching, depicting, categorizing a substantial portion of the available guitar chords through a system of movable chords based on roots. The use made of the plaintiff's Chord-o-Matic has not come within the fair-use doctrine. Rather, it greatly exceeds the scope of any copying permitted under the doctrine of fair use.

The defendant has also raised as an affirmative defense its contention that the Palmer-Hughes book is in a different copyright class from the plaintiff's Chord-o-Matic.

█  Title 17 U.S.C.A. § 5 classifies various types of copyrightable work for purposes of registration; and it is upon this provision that the defendant apparently relies. Section 5, however, contains the following proviso:

"The above specifications shall not be held to limit the subject matter of copyright as defined in section 4 of this title, nor shall any error in classification invalidate or impair the copyright protection secured under this title."

In view of this proviso, the defendant's contention that the Palmer-Hughes book does not infringe the Chord-o-Matic is not well taken. Section 5 of Title 17 specifically provides, in cases such as the present one, that the fact that the Palmer-Hughes book is a book and that the Chord-o-Matic is a drawing does not place the Palmer-Hughes book outside the scope of the Chord-o-Matic's copyright protection.

The defendant's remaining contentions all relate to the marking and labeling of the Chord-o-Matic.

The plaintiff filed his applications for copyright and trademark himself without the aid or counsel of an attorney. The plaintiff is not a lawyer, and has a very limited knowledge of copyright law. From the evidence presented, the Court has concluded that any errors or inadequacies in the marking of the Chord-o-Matic and its accompanying literature were entirely inadvertent and were not intended to deceive either the copyright office or the public.

The defendant asserts that the copyright is invalid on the ground that it is defective in naming the copyright proprietor. The Chord-o-Matic and its accompanying information indicate that the copyright proprietor is Trebb Sales, when in fact it is Joseph Trebonik, the individual.

█  Joseph Trebonik does business under the name of Trebb Sales, which is his sole proprietorship. There was no evidence that anyone was misled or prejudiced in any way by this slight imperfection in labeling. The Court finds that the proprietor was indicated with sufficient specificity to meet the requirements of Title 17 U.S.C.A. § 19, and that the notice is not defective. Gelles-Widmer Co. v. Milton Bradley Co., 313 F.2d 143 (7 Cir. 1963); Hollywood Jewelry Mfg. Co. v. Dushkin, 136 F.Supp. 738 (S.D. N.Y.1955); Doran v. Sunset House Distributing Corp., 197 F.Supp. 940 (D.C. Cal.1961), aff'd 304 F.2d 251 (9th Cir. 1961).

█  Defendant asserts that the plaintiff has no standing to sue. This contention is without merit, since the plaintiff is the author of the Chord-o-Matic and owner of its copyright. Kurlan v. C. I. R., 343 F.2d 625 (2 Cir. 1965); Manning v. Miller Music Corp., 174 F.Supp. 192 (S.D.N.Y.1959).

█  Defendant asserts that the copyright is invalid on the ground that the plaintiff has published it without the year date notice required by Title 17 U.S.C.A. § 19. Section 19 provides that:

"The notice of copyright * * * shall consist * * * of the word 'Copyright' * * * accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication."

The plaintiff's Chord-o-Matic is not a "literary, musical, or dramatic work." No year date notice is, therefore, re-

quired. Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc., 73 F.2d 276 (2 Cir. 1934); Prestige Floral, Societe Anonyme v. Calif. Artificial Flower Co., 201 F. Supp. 287 (S.D.N.Y.1962).

■ The defendant also asserts that the plaintiff cannot enforce his copyright because he is guilty of unclean hands as a result of his marking the Chord-o-Matic words importing that it is a patented article for the purpose of deceiving the public. Title 35 U.S.C.A. § 292(a). The Court has previously found that the errors and inaccuracies in the marking of the Chord-o-Matic and its accompanying material were the result of inadvertence rather than intentional deception. In addition, since the Chord-o-Matic itself and the accompanying material all indicate that they are copyrighted and not patented, it is inconceivable that anyone could have been misled by the references to the U. S. Patent Office.

By reason of the foregoing findings of fact and conclusions of law, the Court enters judgment on the complaint and counterclaim in favor of Joseph Trebonik and against Grossman Music Corporation. It is further ordered:

1) That the defendant, its agents and servants are hereby enjoined from infringing the plaintiff's copyright in any manner and from distributing, selling, marketing, or otherwise disposing of any copies of the book "How to Play Rock 'n Roll Chords in all Positions" by Palmer-Hughes.

2) The plaintiff shall have an accounting from the defendant for all gains, profits, and advantages derived by reason of the defendant's infringement of the plaintiff's copyright, in addition to such damages as plaintiff has sustained as a consequence of the defendant's infringement. All proceedings on this accounting shall be deferred, however, until further order of this Court.

3) The defendant shall be required to pay all costs in this action.

It is so ordered.