562 F.2d 1157
 196 U.S.P.Q. 97
 SID & MARTY KROFFT TELEVISION PRODUCTIONS, INC. and Sid &
Marty Krofft Productions, Inc., Plaintiffs-Appellants,
v.
McDONALD'S CORPORATION and Needham, Harper & Steers, Inc.,
Defendants- Appellees.
SID & MARTY KROFFT TELEVISION PRODUCTIONS, INC. and Sid &
Marty Krofft Productions, Inc., Plaintiffs-Appellees,
v.
McDONALD'S CORPORATION and Needham, Harper & Steers, Inc.,
Defendants- Appellants.
 Nos. 75-1203 and 75-1202.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 12, 1977.
Rehearing Denied Nov. 17, 1977.
 
 Anthony E. Liebig, Lillick, McHose & Charles, Los Angeles, Cal., argued for McDonald's Corp. et al.
 Melville B. Nimmer, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Bayard F. Berman and James P. Tierney, Beverly Hills, Cal., argued for Sid & Marty Krofft Television.
 Appeal from the United States District Court for the Central District of California.
 Before CARTER, GOODWIN, and SNEED, Circuit Judges.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is a copyright infringement action. Plaintiffs Sid and Marty Krofft Television Productions, Inc., and Sid and Marty Krofft Productions, Inc. were awarded $50,000.00 in their action against defendants McDonald's Corporation and Needham, Harper & Steers, Inc. Defendants were found to have infringed plaintiffs' "H. R. Pufnstuf" children's television show by the production of their "McDonaldland" television commercials.
 
 
 2
 Plaintiffs argue on appeal that the district court erred in awarding damages pursuant to 17 U.S.C. § 101(b). They contend that the court should have ordered an accounting of profits by defendants or, alternatively, should have awarded statutory "in lieu" damages.
 
 
 3
 Defendants cross-appeal. They contend that their television commercials did not infringe upon plaintiffs' television series as a matter of law. To find infringement, they suggest, would abridge their first amendment rights. They also refute plaintiffs' contentions as to damages.
 
 
 4
 We believe that the district court's finding of infringement was not clearly erroneous, and see no merit to defendants' first amendment claims, We find, however, that the district court was in error in awarding damages. We therefore affirm in part, reverse in part, and remand for further proceedings.
 
 Facts
 
 5
 In 1968, Sid and Marty Krofft were approached by the NBC television network to create a children's television program for exhibition on Saturday morning.[1] The Kroffts spent the next year creating the H. R. Pufnstuf television show, which was introduced on NBC in September 1969. The series included several fanciful costumed characters, as well as a boy named Jimmy, who lived in a fantasyland called "Living Island," which was inhabited by moving trees and talking books. The television series became extremely popular and generated a line of H. R. Pufnstuf products and endorsements.
 
 
 6
 In early 1970, Marty Krofft, the President of both Krofft Television and Krofft Productions and producer of the show, was contacted by an executive from Needham, Harper & Steers, Inc., an advertising agency. He was told that Needham was attempting to get the advertising account of McDonald's hamburger restaurant chain and wanted to base a proposed campaign to McDonald's on the H. R. Pufnstuf characters. The executive wanted to know whether the Kroffts would be interested in working with Needham on a project of this type.
 
 
 7
 Needham and the Kroffts were in contact by telephone six or seven more times. By a letter dated August 31, 1970, Needham stated it was going forward with the idea of a McDonaldland advertising campaign based on the H. R. Pufnstuf series. It acknowledged the need to pay the Kroffts a fee for preparing artistic designs and engineering plans. Shortly thereafter, Marty Krofft telephoned Needham only to be told that the advertising campaign had been cancelled.
 
 
 8
 In fact, Needham had already been awarded McDonald's advertising account and was proceeding with the McDonaldland project.[2] Former employees of the Kroffts were hired to design and construct the costumes and sets for McDonaldland. Needham also hired the same voice expert who supplied all of the voices for the Pufnstuf characters to supply some of the voices for the McDonaldland characters. In January 1971, the first of the McDonaldland commercials was broadcast on network television. They continue to be broadcast.
 
 
 9
 Prior to the advent of the McDonaldland advertising campaign, plaintiffs had licensed the use of the H. R. Pufnstuf characters and elements to the manufacturers of toys, games, lunch boxes, and comic books. In addition, the H. R. Pufnstuf characters were featured in Kellogg's cereal commercials and used by the Ice Capades. After the McDonaldland campaign, which included the distribution of toys and games, plaintiffs were unable to obtain new licensing arrangements or extend existing ones.[3] In the case of the Ice Capades, the H. R. Pufnstuf characters were actually replaced by the McDonaldland characters.
 
 
 10
 Plaintiffs filed suit in September 1971. The complaint alleged, inter alia, that the McDonaldland advertising campaign infringed the copyrighted H. R. Pufnstuf television episodes as well as various copyrighted articles of Pufnstuf merchandise.[4] By way of relief, plaintiffs sought compensatory damages of $250,000, an order for an accounting of profits attributable to the infringements, or, in the alternative, statutory "in lieu" damages, as provided by 17 U.S.C. § 101(b). Prior to trial, the district court signed a Pre-Trial Conference Order that was "approved as to form and content" by counsel for both sides. It provided that "(t)he prayer for relief raises issues of injunctive relief and an accounting which are questions for the Court."
 
 
 11
 The three week jury trial began on November 27, 1973. The jurors were shown for their consideration on the question of infringement: (1) two H. R. Pufnstuf television episodes; (2) various items of H. R. Pufnstuf merchandise, such as toys, games, and comic books; (3) several 30 and 60 second McDonaldland television commercials; and (4) various items of McDonaldland merchandise distributed by McDonald's, such as toys and puzzles. The jury was instructed that it was not to consider defendants' profits in determining damages, but could consider the value of use by the defendants of plaintiffs' work.
 
 
 12
 A verdict in favor of plaintiffs was returned and damages of $50,000.00 assessed. After the verdict, the parties briefed the question of whether plaintiffs were entitled to additional monetary recovery in the form of profits or statutory "in lieu" damages. The district court denied plaintiffs' claim for such relief. The court found that these matters were properly for the jury to consider so that it would not exercise its discretion in hearing further evidence. These appeals followed.
 
 I. INFRINGEMENT
 Proof of Infringement
 
 13
 It has often been said that in order to establish copyright infringement a plaintiff must prove ownership of the copyright and "copying" by the defendant. See, e. g., Reyher v. Children's Television Workshop, 533 F.2d 87, 90 (2 Cir. 1976); Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904, 907 (3 Cir. 1975); 2 M. Nimmer on Copyright § 141 at 610-11 (1976) (hereinafter "Nimmer"). "Copying," in turn, is said to be shown by circumstantial evidence of access to the copyrighted work and substantial similarity between the copyrighted work and defendant's work. Reyher v. Children's Television Workshop, supra, 533 F.2d at 90; 2 Nimmer § 141.2 at 613. But an analysis of the cases suggests that these statements frequently serve merely as boilerplate to copyright opinions.
 
 
 14
 Under such statements, infringement would be established upon proof of ownership, access, and substantial similarity. Application of this rule, however, would produce some untenable results. For example, a copyright could be obtained over a cheaply manufactured plaster statue of a nude. Since ownership of a copyright is established, subsequent manufacturers of statues of nudes would face the grave risk of being found to be infringers if their statues were substantially similar and access were shown. The burden of proof on the plaintiff would be minimal, since most statues of nudes would in all probability be substantially similar to the cheaply manufactured plaster one.[5]
 
 
 15
 Clearly the scope of copyright protection does not go this far. A limiting principle is needed. This is provided by the classic distinction between an "idea" and the "expression" of that idea. It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself. Mazer v. Stein, 347 U.S. 201, 217-18, 74 S.Ct. 460, 98 L.Ed. 630 (1954); Baker v. Selden, 101 U.S. 99, 102-03, 25 L.Ed. 841 (1879). This principle attempts to reconcile two competing social interests: rewarding an individual's creativity and effort while at the same time permitting the nation to enjoy the benefits and progress from use of the same subject matter.
 
 
 16
 The real task in a copyright infringement action, then, is to determine whether there has been copying of the expression of an idea rather than just the idea itself. "(N)o one infringes, unless he descends so far into what is concrete (in a work) as to invade . . . (its) expression." National Comics Publications v. Fawcett Publications, 191 F.2d 594, 600 (2 Cir. 1951). Only this expression may be protected and only it may be infringed.[6]
 
 
 17
 The difficulty comes in attempting to distill the unprotected idea from the protected expression. No court or commentator in making this search has been able to improve upon Judge Learned Hand's famous "abstractions test" articulated in Nichols v. Universal Pictures Corporation, 45 F.2d 119 (2 Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931):
 
 
 18
 "Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended." 45 F.2d at 121.
 
 
 19
 See also Chafee, Reflections on the Law of Copyright, 45 Colum.L.Rev. 503 (1945); Esezobar, Concepts in Copyright Protection, 23 Bull.Cprt.Soc. 258 (1976); Note, "Expression" and "Originality" in Copyright Law, 11 Washburn L.J. 400 (1972).
 
 
 20
 The test for infringement therefore has been given a new dimension. There must be ownership of the copyright and access to the copyrighted work. But there also must be substantial similarity not only of the general ideas but of the expressions of those ideas as well. Thus two steps in the analytic process are implied by the requirement of substantial similarity.
 
 
 21
 The determination of whether there is substantial similarity in ideas may often be a simple one. Returning to the example of the nude statue, the idea there embodied is a simple one a plaster recreation of a nude human figure. A statue of a horse or a painting of a nude would not embody this idea and therefore could not infringe. The test for similarity of ideas is still a factual one, to be decided by the trier of fact. See International Luggage Registry v. Avery Products Corp., 541 F.2d 830, 831 (9 Cir. 1976); Williams v. Kaag Manufacturers, Inc., 338 F.2d 949, 951 (9 Cir. 1964).
 
 
 22
 We shall call this the "extrinsic test." It is extrinsic because it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed. Such criteria include the type of artwork involved, the materials used, the subject matter, and the setting for the subject. Since it is an extrinsic test, analytic dissection and expert testimony are appropriate. Moreover, this question may often be decided as a matter of law.
 
 
 23
 The determination of when there is substantial similarity between the forms of expression is necessarily more subtle and complex. As Judge Hand candidly observed, "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2 Cir. 1960). If there is substantial similarity in ideas, then the trier of fact must decide whether there is substantial similarity in the expressions of the ideas so as to constitute infringement.
 
 
 24
 The test to be applied in determining whether there is substantial similarity in expressions shall be labeled an intrinsic one depending on the response of the ordinary reasonable person. See International Luggage Registry v. Avery Products Corp., supra, 541 F.2d at 831; Harold Lloyd Corp. v. Witwer, 65 F.2d 1, 18-19 (9 Cir. 1933). See generally Nimmer § 143.5. It is intrinsic because it does not depend on the type of external criteria and analysis which marks the extrinsic test. As this court stated in Twentieth Century-Fox Film Corp. v. Stonesifer, 140 F.2d 579, 582 (9 Cir. 1944):
 
 
 25
 "The two works involved in this appeal should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator."
 
 
 26
 Because this is an intrinsic test, analytic dissection and expert testimony are not appropriate.
 
 
 27
 This same type of bifurcated test was announced in Arnstein v. Porter, 154 F.2d 464, 468-69 (2 Cir. 1946), cert. denied, 330 U.S. 851, 67 S.Ct. 1096, 91 L.Ed. 1294 (1947). The court there identified two separate elements essential to a plaintiff's suit for infringement: copying and unlawful appropriation. Under the Arnstein doctrine, the distinction is significant because of the different tests involved.
 
 
 28
 "(T)he trier of fact must determine whether the similarities are sufficient to prove copying. On this issue, analysis ('dissection') is relevant, and the testimony of experts may be received to aid the trier of facts. * * * If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation). On that issue . . . the test is the response of the ordinary lay hearer; accordingly, on that issue, 'dissection' and expert testimony are irrelevant." 154 F.2d at 468 (footnotes omitted).
 
 
 29
 We believe that the court in Arnstein was alluding to the idea-expression dichotomy which we make explicit today. When the court in Arnstein refers to "copying" which is not itself an infringement, it must be suggesting copying merely of the work's idea, which is not protected by the copyright. To constitute an infringement, the copying must reach the point of "unlawful appropriation," or the copying of the protected expression itself. We analyze this distinction in terms both of the elements involved idea and expression and of the tests to be used extrinsic and intrinsic in an effort to clarify the issues involved.
 
 The Tests Applied
 
 30
 In the context of this case, the distinction between these tests is important. Defendants do not dispute the fact that they copied the idea of plaintiffs' Pufnstuf television series basically a fantasyland filled with diverse and fanciful characters in action. They argue, however, that the expressions of this idea are too dissimilar for there to be an infringement. They come to this conclusion by dissecting the constituent parts of the Pufnstuf series characters, setting, and plot and pointing out the dissimilarities between these parts and those of the McDonaldland commercials.
 
 
 31
 This approach ignores the idea-expression dichotomy alluded to in Arnstein and analyzed today. Defendants attempt to apply an extrinsic test by the listing of dissimilarities in determining whether the expression they used was substantially similar to the expression used by plaintiffs. That extrinsic test is inappropriate; an intrinsic test must here be used. As the court in Arnstein stated:
 
 
 32
 "Whether (if he copied) defendant unlawfully appropriated presents, too, an issue of fact. The proper criterion on that issue is not an analytic or other comparison of the respective . . . compositions . . . . The plaintiff's legally protected interest in the potential financial return from his compositions which derive from the lay public's approbation of his efforts. The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the (eyes and) ears of lay (persons), who comprise the audience for whom such popular (works are) composed, that defendant wrongfully appropriated something which belongs to the plaintiff. Surely, then, we have an issue of fact which a jury is peculiarly fitted to determine." 154 F.2d at 472-73 (footnotes omitted).
 
 
 33
 Analytic dissection, as defendants have done, is therefore improper.
 
 
 34
 Defendants contest the continued viability of Arnstein. It is true that Arnstein's alternative holding that summary judgment may not be granted when there is the slightest doubt as to the facts has been disapproved. See, e. g., First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Beal v. Lindsay, 468 F.2d 287, 291 (2 Cir. 1972); Janis v. Wilson, 385 F.Supp. 1143, 1147 (D.S.D.1974); Keller v. California Liquid Gas Corp., 363 F.Supp. 123, 126 (D.Wyo.1973). But the case's tests for infringement have consistently been approved by this court. See, e. g., Goodson-Todman Enterprises, Inc. v. Kellogg Co., 513 F.2d 913, 914 (9 Cir. 1975); Overman v. Loesser, 205 F.2d 521, 523 (9 Cir. 1953). They have also been accepted by other courts. See, e. g., Universal Athletic Sales Co. v. Salkeld, supra, 511 F.2d at 907; Scott v. WKJG, Inc., 376 F.2d 467, 469 (7 Cir. 1967).[7] We believe Arnstein is still good law.
 
 
 35
 Since the intrinsic test for expression is uniquely suited for determination by the trier of fact, this court must be reluctant to reverse it. See International Luggage Registry v. Avery Products Corp.,supra, 541 F.2d at 831; Caddy-Imler Creations, Inc. v. Caddy, 299 F.2d 79, 82 (9 Cir. 1962). As this court said in Williams v. Kaag Manufacturers, Inc., supra, 338 F.2d at 951:
 
 
 36
 "We have commented frequently on the inappropriateness of substituting our judgment for that of the trial judge on questions of fact. The more vague the test, the less inclined we are to intervene."
 
 
 37
 As a finding of fact, a conclusion as to the question of copying is subject to the "clearly erroneous" standard. Fed.R.Civ.P. 52(a). But it follows that this court will be less likely to find clear error when the subjective test for copying of expression has been applied.
 
 
 38
 The present case demands an even more intrinsic determination because both plaintiffs' and defendants' works are directed to an audience of children. This raises the particular factual issue of the impact of the respective works upon the minds and imaginations of young people. As the court said in Ideal Toy Corp. v. Fab-Lu Ltd., 261 F.Supp. 238, 241-42 (S.D.N.Y.1966), aff'd, 360 F.2d 1021 (2 Cir. 1966):
 
 
 39
 "In applying the test of the average lay observer, (children) are not to be excluded indeed they are the 'far-flung faithful . . . audience.' The television advertising campaign of plaintiff was directed toward acquainting these youngsters with . . . its new teenage and pre-teen dolls. The impression of the faces and general appearance of the dolls was upon them. . . . (T)he dolls create the same impression, both with respect to their appearances and the play uses for which they are suited. It is the youngsters who, on the basis of this impression, go to the stores with their parents or at home make their wishes known for the dolls they desire after television has made its impact upon them. In their enthusiasm to acquire . . . (the dolls) they certainly are not bent upon 'detecting disparities' or even readily observing upon inspection such fine details as the point at which the necks are molded" (citations and footnotes omitted).
 
 
 40
 The H. R. Pufnstuf series became the most popular children's show on Saturday morning television. This success led several manufacturers of children's goods to use the Pufnstuf characters. It is not surprising, then, that McDonald's hoped to duplicate this peculiar appeal to children in its commercials.[8] It was in recognition of the subjective and unpredictable nature of children's responses that defendants opted to recreate the H. R. Pufnstuf format rather than use an original and unproven approach.
 
 
 41
 Defendants would have this court ignore that intrinsic quality which they recognized to embark on an extrinsic analysis of the two works. For example, in discussing the principal characters Pufnstuf and Mayor McCheese defendants point out:
 
 
 42
 " 'Pufnstuf' wears what can only be described as a yellow and green dragon suit with a blue cummerband from which hangs a medal which says 'mayor'. 'McCheese' wears a version of pink formal dress 'tails' with knicker trousers. He has a typical diplomat's sash on which is written 'mayor', the 'M' consisting of the McDonald's trademark of an 'M' made of golden arches."
 
 
 43
 So not only do defendants remove the characters from the setting, but dissect further to analyze the clothing, colors, features, and mannerisms of each character. We do not believe that the ordinary reasonable person, let alone a child, viewing these works will even notice that Pufnstuf is wearing a cummerbund while Mayor McCheese is wearing a diplomat's sash.
 
 
 44
 Duplication or near identity is not necessary to establish infringement. Runge v. Lee, 441 F.2d 579, 582 (9 Cir. 1971); Williams v. Kaag Manufacturers, Inc., supra, 338 F.2d at 951. As this court stated in Universal Pictures Co., Inc. v. Harold Lloyd Corp., infra, 162 F.2d 354, at 360:
 
 
 45
 "(A)n infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy."
 
 
 46
 And, as Judge Learned Hand put it, copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2 Cir. 1930).
 
 
 47
 We have viewed representative samples of both the H. R. Pufnstuf show and McDonaldland commercials. It is clear to us that defendants' works are substantially similar to plaintiffs'.[9] They have captured the "total concept and feel" of the Pufnstuf show. Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1110 (9 Cir. 1970). We would so conclude even if we were sitting as the triers of fact. There is no doubt that the findings of the jury in this case are not clearly erroneous.
 
 Unity of Idea and Expression
 
 48
 Defendants argue that dissection is proper and that duplication or near identity is necessary because the competing works are things, rather than dramatic works. They cite numerous cases in which infringement was found because the defendants' works were nearly identical to those of the plaintiffs. See, e. g., Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (circus posters); Sunset House Distributing Corp. v. Doran, 304 F.2d 251, 252 (9 Cir. 1962) (plastic Santa Claus); King Features Syndicate v. Fleischer, 299 F. 533, 534 (2 Cir. 1924) (doll). Defendants fail to perceive, however, that near identity may be required in some cases not because the works are things, but because the expression of those works and the idea of those works are indistinguishable.
 
 
 49
 Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738 (9 Cir. 1971), upon which defendants rely, is illustrative of this point. In that case, plaintiff sued for infringement of its jeweled bee pin, claiming it should be protected against the manufacture of any substantially similar object. This court responded:
 
 
 50
 "What is basically at stake is the extent of the copyright owner's monopoly from how large an area of activity did Congress intend to allow the copyright owner to exclude others? We think the production of jeweled bee pins is a larger private preserve than Congress intended to be set aside in the public market without a patent. A jeweled bee pin is therefore an idea that defendants were free to copy. Plaintiff seems to agree, for it disavows any claim that defendants cannot manufacture and sell jeweled bee pins and concedes that only plaintiffs' particular design or expression of the jeweled bee pin idea is protected under its copyright. The difficulty, as we have noted, is that on this record the idea and its expression appear to be indistinguishable. There is no greater similarity between the pins of plaintiff and defendants than is inevitable from the use of jewel-encrusted bee forms in both.
 
 
 51
 "When the idea and its expression are thus inseparable, copying the expression will not be barred, since protecting the expression in such circumstances would confer a monopoly of the idea upon the copyright owner free of the conditions and limitations imposed by the patent law." Id. at 742.
 
 
 52
 See also Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co., Inc., 509 F.2d 64, 65 (2 Cir. 1974).
 
 
 53
 The idea and the expression will coincide when the expression provides nothing new or additional over the idea. Thus, the expression of a jeweled bee pin contains nothing new over the idea of a jeweled bee pin. Returning to our own example, the idea of a plaster statute of a nude will probably coincide with the expression of that idea when an inexpensive manufacturing process is used. There will be no separately distinguishable features in the statute's expression over the idea of a plaster nude statute.[10]
 
 
 54
 The complexity and artistry of the expression of an idea will separate it from even the most banal idea. Michaelangelo's David is, as an idea, no more than a statute of a nude male. But no one would question the proposition that if a copyrighted work it would deserve protection even against the poorest of imitations. This is because so much more was added in the expression over the idea.
 
 
 55
 When idea and expression coincide, there will be protection against nothing other than identical copying of the work. When other defendants made jeweled bees from the same molds as plaintiffs, they were held liable. See Herbert Rosenthal Jewelry Corp. v. Grossbardt, 436 F.2d 315 (2 Cir. 1970). Therefore, the scope of copyright protection increases with the extent expression differs from the idea.
 
 
 56
 The coincidence of idea and expression may occur in works other than "things."[11] Baker v. Selden, supra, held that blank accounting books are not subject to copyright protection. Yet if any information is contained in those blanks, copyright protection is available. See Edwin K. Williams & Co. v. Edwin K. Williams, etc., 542 F.2d 1053, 1060-61 (9 Cir. 1976) (account books with explanation); Guthrie v. Curlett, 36 F.2d 694 (2 Cir. 1929) (index of freight tariffs); American Code Co. v. Bensinger, 282 F. 829 (2 Cir. 1922) (codes).
 
 
 57
 There is no special standard of similarity required in the case of "things." Nor is any such standard suggested by any of the cases cited by defendants. For example, in Monogram Models, Inc. v. Industro Motive Corp., 492 F.2d 1281, 1284 (6 Cir. 1974), the issue was one of copyright infringement of scale model airplane kits. Defendant admitted copying, but argued lack of substantial copying. The court affirmed a jury finding of infringement, citing the ordinary reasonable observer test. Id. at 1286. See also Williams v. Kaag Manufacturing, Inc., supra, 338 F.2d at 951 (cowboy statuettes); Day-Brite Lighting, Inc. v. Sta-Brite Flourescent Manufacturing Co., 308 F.2d 377, 380 (5 Cir. 1962) (catalogue).
 
 
 58
 No standard more demanding than that of substantial similarity should be imposed here. This is not a case where the idea is indistinguishable as a matter of law from the expression of that idea. See Goodson-Todman Enterprises, Inc. v. Kellogg Co., supra, 513 F.2d at 914. The expression inherent in the H. R. Pufnstuf series differs markedly from its relatively simple idea. The characters each have developed personalities and particular ways of interacting with one another and their environment. The physical setting also has several unique features.
 
 
 59
 Lest we fall prey to defendants' invitation to dissect the works, however, we should remember that it is the combination of many different elements which may command copyright protection because of its particular subjective quality. Reyher v. Children's Television Workshop, Inc., supra, 533 F.2d at 91-92; Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623, 624 (2 Cir. 1962). As the court said in Malkin v. Dubinsky, 146 F.Supp. 111, 114 (S.D.N.Y.1956): "While any one similarity taken by itself seems trivial, I cannot say at this time that it would be improper for a jury to find that the over-all impact and effect indicate substantial appropriation."[12] The same is true here.[13]
 
 Copyright and the First Amendment
 
 60
 Defendants argue that the first amendment operates in this case to limit the protection for plaintiffs' works.[14] They seem to suggest that a more demanding standard than that of substantial similarity should be imposed, and that the threshold question about copying becomes one of "constitutional fact" to be reviewed de novo on appeal. Defendants attempt to analogize the copyright area to those of obscenity and defamation in suggesting that prior law must be modified to accommodate expanding first amendment rights.
 
 
 61
 The constitutionality of the copyright law was settled long ago by the Supreme Court. In Kalem Co. v. Harper Brothers, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92 (1911), the defendant argued that the copyright law could not grant an author an exclusive right to dramatize his works. In rejecting this contention, the Court stated:"It is argued that the law, construed as we have construed it, goes beyond the power conferred upon Congress by the Constitution, to secure to authors for a limited time the exclusive right to their writings. Art. I, § 8, cl. 8. It is suggested that to extend the copyright to a case like this is to extend it to the ideas, as distinguished from the words in which the ideas are clothed. But there is no attempt to make a monopoly of the ideas expressed. The law confines itself to a particular, cognate, and well-known form of reproduction. If to that extent a grant of monopoly is thought a proper way to secure the right to the writings, this court cannot say that Congress was wrong." Id. at 63, 32 S.Ct. at 22.
 
 
 62
 The Court recognized that the protection of the copyright laws is necessary to provide an incentive for artistic creation which ultimately advances the public good. See Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975).
 
 
 63
 But the impact, if any, of the first amendment on copyright has not been discussed by the Court.[15] We believe this silence stems not from neglect but from the fact that the idea-expression dichotomy already serves to accommodate the competing interests of copyright and the first amendment. The "marketplace of ideas" is not limited by copyright because copyright is limited to protection of expression. As one commentator has stated:
 
 
 64
 "(T)he idea-expression line represents an acceptable definitional balance as between copyright and free speech interests. In some degree it encroaches upon freedom of speech in that it abridges the right to reproduce the 'expression' of others, but this is justified by the greater public good in the copyright encouragement of creative works. In some degree it encroaches upon the author's right to control his work in that it renders his 'ideas' per se unprotectible, but this is justified by the greater public need for free access to ideas as part of the democratic dialogue."
 
 
 65
 Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press ?, 17 U.C.L.A.L.Rev. 1180, 1192-93 (1970). Cf. Lee v. Runge, 404 U.S. 887, 892-93, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971) (Douglas, J., dissenting).
 
 
 66
 Ideas which may be of public interest are not subject to copyright; the specific form of expression of these ideas are. Thus, the political views of Dr. Martin Luther King may be widely disseminated. But the precise expression of these views in a speech may be protected. King v. Mister Maestro, Inc., 224 F.Supp. 101 (S.D.N.Y.1963). See also Public Affairs Associates, Inc. v. Rickover, 177 F.Supp. 601 (D.D.C.1960), rev'd, 109 U.S.App.D.C. 128, 284 F.2d 262 (1960), rev'd, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), on remand, 268 F.Supp. 444 (D.D.C.1967); Atlantic Monthly Co. v. Post Pub. Co., 27 F.2d 556 (D.Mass.1928). Similarly, the facts about a historical figure are available to all to use. But if the expression of those facts in a biography is substantially copied infringement will be found. See, e. g., Toksvig v. Bruce Publishing Co., 181 F.2d 664 (7 Cir. 1950); Marvin Worth Productions v. Superior Films Corp., 319 F.Supp. 1269 (S.D.N.Y.1970); Holdredge v. Knight Publishing Corp., 214 F.Supp. 921 (C.D.Cal.1963).
 
 
 67
 With the law of copyright permitting the free use of ideas, it is not surprising that the few courts addressing the issue have not permitted defendants who copy a work's expression to hide behind the first amendment. See, e. g., Duchess Music Corp. v. Stern, 458 F.2d 1305, 1310-11 (9 Cir. 1972); United States v. Bodin, 375 F.Supp. 1265, 1267-68 (W.D.Okl.1974); McGraw Hill, Inc. v. Worth Publishers, Inc., 335 F.Supp. 415, 422 (S.D.N.Y.1971). In Walt Disney Productions v. Air Pirates, 345 F.Supp. 108 (N.D.Cal.1972), plaintiff sued for infringement of several of its famous cartoon characters by defendants, who used them for purposes of literary criticism. Defendants claimed that the first amendment limited the scope of plaintiff's copyright protection. The court responded:
 
 
 68
 "However defendants would have it, the hard fact remains that both parties are dealing in cartoon series, comic books or strips, and that the mode which the defendants have chosen for the expression of their concepts amounts to a substantial taking of plaintiff's expression of its concepts, even assuming vast difference in the content of those concepts. It can scarcely be maintained that there is no other means available to defendants to convey the message they have, nor is it even clear that other means are not available within the chosen genre of comics and cartoons. To paraphrase, it is true that it would be easier to copy substantial portions of the expression as distinguished from the idea itself of the Disney works, but the value of such labor-saving utility is far outweighed by the copyright interest in encouraging creation by protecting expression." Id. at 115 (footnotes omitted).
 
 
 69
 The district court in Disney recognized that the expression inherent in plaintiff's works differs from the mere idea of those works. The "idea" of Mickey Mouse is, after all, no more than a mouse. Yet the particular expression of that mouse has phenomenal commercial value and is recognized worldwide. Defendants there could have chosen any number of ways to express their idea of a mouse, but chose to copy Disney's. So too the defendants in this case had many ways to express the idea of a fantasyland with characters, but chose to copy the expression of plaintiffs'. The first amendment will not protect such imitation.
 
 
 70
 There may be certain rare instances when first amendment considerations will operate to limit copyright protection for graphic expressions of newsworthy events.[16] For example, in Time, Inc. v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968), Life magazine sued a historian for copying frames of the Zapruder films of the assassination of John F. Kennedy. Although the court did not expressly invoke the first amendment, it did justify the defendant's right to copy frames of the film on the ground of the "public interest in having the fullest information available on the murder of President Kennedy." Id. at 146. Plaintiffs' work in this case is neither a graphic expression nor concerning newsworthy events. Therefore, no first amendment considerations operate.[17]Access
 
 
 71
 In addition to substantial similarity, a plaintiff must show access in order to prove infringement. Reyher v. Children's Television Workshop, supra, 533 F.2d at 90; 2 Nimmer § 141.2 at 613. Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work. Arrow Novelty Co. v. Enco National Corp., 393 F.Supp. 157, 160 (S.D.N.Y.), aff'd, 515 F.2d 504 (2 Cir. 1975); Universal Athletic Sales Co. v. Salkeld, 340 F.Supp. 899, 901 (W.D.Pa.1972). In this case, there is no dispute as to defendants' access to plaintiffs' work. Indeed, defendants were engaged in negotiations with plaintiffs for licensing of the works even while preparing the McDonaldland commercials.
 
 
 72
 No amount of proof of access will suffice to show copying if there are no similarities. Williams v. Kaag Manufacturers, Inc., supra, 338 F.2d at 951; Arnstein v. Porter, supra, 154 F.2d at 468. This is not to say, however, that where clear and convincing evidence of access is presented, the quantum of proof required to show substantial similarity may not be lower than when access is shown merely by a preponderance of the evidence. As Professor Nimmer has observed:
 
 
 73
 "(C)lear and convincing evidence of access will not avoid the necessity of also proving substantial similarity since access without similarity cannot create an inference of copying. However, this so-called 'Inverse Ratio Rule' . . . would seem to have some limited validity. That is, since a very high degree of similarity is required in order to dispense with proof of access, it must logically follow that where proof of access is offered, the required degree of similarity may be somewhat less than would be necessary in the absence of such proof." 2 Nimmer § 143.4 at 634.
 
 
 74
 Accord, Fink v. Goodson-Todman Enterprises, Ltd., 9 Cal.App.3d 996, 1013, 88 Cal.Rptr. 679 (1970). We agree. But see Arc Music Corp. v. Lee, 296 F.2d 186 (2 Cir. 1961).
 
 
 75
 In this case, representatives of Needham actually visited the Kroffts' headquarters in Los Angeles to discuss the engineering and design work necessary to produce the McDonaldland commercials. They did this after they had been awarded the contract by McDonald's and apparently with no intention to work with the Kroffts. We believe that this degree of access justifies a lower standard of proof to show substantial similarity. Since the subjective test applies, it is impossible to quantify this standard. But there is no question it is met here.
 
 II. DAMAGES
 Awarding Damages
 
 76
 Section 101(b), 17 U.S.C., provides that a copyright infringer shall be liable as follows:
 
 
 77
 "(b) Damages and profits; amount; other remedies.
 
 
 78
 To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only, and the defendant shall be required to prove every element of cost which he claims. . . ."
 
 
 79
 Thus, a court in making an award for infringement must determine both actual damages suffered by a plaintiff and profits from the infringement made by defendant.
 
 
 80
 While there is disagreement as to whether both damages and profits are to be included in the award, an issue we will take up shortly, there is agreement that a successful plaintiff is entitled to at least the greater of damages or profits. See Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 375-77 (9 Cir. 1947); L & L White Metal Casting Corp. v. Joseph,387 F.Supp. 1349, 1357 (E.D.N.Y.1975); 2 Nimmer §§ 150-51 at 666-69. In order to accurately determine profits, a defendant may be required to make an accounting. 2 Nimmer § 153.2 at 674.
 
 
 81
 The jury assessed damages of $50,000 against defendants in this case. Subsequent to the return of the verdict, counsel for both sides, at the district court's request, briefed the question of whether plaintiffs were entitled to additional monetary recovery either in the form of profits or statutory "in lieu" damages. After considering this question, the district court concluded that plaintiffs were not entitled to any additional recovery and denied plaintiffs' motion for an accounting of profits by defendants.
 
 
 82
 The issues on appeal are threefold: (1) whether the jury considered profits in assessing damages; (2) if not, whether plaintiffs are entitled to recovery of damages and profits or merely damages or profits; and (3) whether, if profits cannot accurately be determined, plaintiffs are entitled to statutory "in lieu" damages.
 
 Consideration of Profits by the Jury
 
 83
 Two weeks before trial, the district court signed the Pre-Trial Conference Order that was prepared and "approved as to form and content" by counsel for both sides. It provided:
 
 
 84
 "All factual questions of liability and damages are for the jury. The prayer for relief raises issues of injunctive relief and an accounting which are questions for the court."
 
 
 85
 Rule 16 of the Federal Rules of Civil Procedure expressly provides that a Pre-Trial Conference Order "when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." There was no modification of this Order at trial or at any other time. Rule 39(a) of the Federal Rules further provides that issues will not be given to the jury when reserved for the court by "written stipulation filed with the court."
 
 
 86
 Defendants argue that plaintiffs' original demand for a jury trial meant that all issues had to go to the jury. See Fed.R.Civ.P. 38(c). But the clear language of the Pre-Trial Conference Order and the subsequent conduct of the parties contradict any claimed general demand for a jury trial.[18] We conclude that the parties intended to withhold the issue of profits from the jury.
 
 
 87
 This conclusion is supported by the instructions given to the jury. Jury Instruction No. 26 was accepted by the court and read to the jury as follows:
 
 
 88
 "(i) Under a claim of copyright infringement a plaintiff, after, and only after, having first established the necessary elements thereof (about which I have previously charged) by a preponderance of the credible evidence, is entitled to recover only such actual damages as he has proven to be attributable to the infringing use of his material, that is to say, they may recover only that sum of money which they have proven to be their actual pecuniary loss.
 
 
 89
 "(ii) The profits of defendants are not to be considered by you in determining plaintiffs' money damages claim hereunder " (emphasis added).
 
 
 90
 The record also shows that inquiry from the court elicited agreement with this instruction from counsel for both sides.[19]
 
 
 91
 Defendants argue that this instruction was designed only to prevent the jury from considering the corporate profits of McDonald's, which are derived from the purveying of food. They point instead to Jury Instruction No. 49, which reads:
 
 
 92
 "If you find that defendants infringed plaintiffs' copyright, plaintiffs are entitled to all of the damages, if any, suffered as a result of such infringement. In arriving at any such damages, you may take into consideration the reasonable value, if any, of plaintiffs' work including the publication and republication rights therein, and the value, if any, to defendants of the use of plaintiffs' works."
 
 
 93
 Defendants claim that the value of use provided in this instruction is equivalent to defendant's profits from the infringement.
 
 
 94
 The value of use reference in Instruction No. 49 is defined as a part of the reasonable value of plaintiffs' work. It amounts to a determination of what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work. That is a different measure than the determination of defendants' actual profits from the infringement. An author might license the use of his copyright either for a lump sum based on the reasonable value of the work or for a royalty derived from the licensee's profits, or for a combination of both.[20]
 
 
 95
 The district court recognized the potential for confusion between these two instructions. It agreed upon an explanation offered by counsel for plaintiffs: "I think that the difference would be that a person may pay to use 'Living Island' and the characters, and then, even though they have paid for them, they may have suffered a loss and suffered no profit." It was only because the district court concluded that there was a difference between profits and value of use that both Instructions 26 and 49 were delivered to the jury. We agree with this distinction.
 
 
 96
 Defendants argue further that profits in fact were considered by the jury. The record does not support this conclusion. No exhibits regarding either defendants' profits were submitted to the jury in the infringement action.[21] We therefore find that the issue of profits was neither submitted to nor considered by the jury.
 
 An Accounting of Profits as a Legal Remedy
 
 97
 In denying plaintiffs' motion for an accounting of profits, the district court relied upon Dairy Queen v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). That case involved claims for breach of contract and trademark infringement in which the plaintiffs also asked for an accounting. The Court ruled that the wording of the claim for relief is not dispositive. The plaintiffs sought money damages and had a right to trial by jury. Id. at 477-78, 82 S.Ct. 894. See also Ross v. Bernhard, 396 U.S. 531, 541-42, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 509, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Plaintiffs' claim for damages and an accounting of profits in this case parallels that made in Dairy Queen.
 
 
 98
 The issue whether an accounting of profits in an infringement action is legal or equitable was considered by the court in Swofford v. B & W, Inc., 336 F.2d 406 (5 Cir.), cert. denied, 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1964). That court held that Dairy Queen controlled, and said:
 
 
 99
 "(A)n accounting for profits, although a creature of equity, is a rule of administration and not of jurisdiction. The court of equity awarded compensatory damages incidental to an injunction to avoid multiplicity of suits and not because the jury lacked competence. We do not believe that this practice in patent and copyright infringement cases, which was justified historically to avoid multiplicity of litigation in a divided procedure, should be continued in a merged system where such multiplicity can be avoided by one civil action. It is a well-settled doctrine that the distinction of jurisdiction, between law and equity, is constitutional, to the extent to which the Seventh Amendment forbids any infringement of the right of trial by jury, as fixed by the common law. To continue the past practice is to convert an administrative rule into a jurisdictional one so as to deprive the parties of a jury on what is basically a money claim for damages based on a charge of . . . infringement." 336 F.2d at 411 (citations omitted).
 
 
 100
 We agree with this reasoning. Plaintiffs in this case had a right to a jury trial.[22]
 
 
 101
 But a right is not an obligation. Dairy Queen only decided when a party has a right to a jury trial. It certainly cannot be read to hold that the parties are required to have a jury determination even if they do not wish it. It is clear from our analysis of the Pre-Trial Conference Order and jury instructions that the parties did not intend the jury to consider profits. The district court therefore was in error in concluding that Dairy Queen compelled the jury to consider profits in this case.
 
 Conclusion
 
 102
 The judgment of the district court finding infringement is affirmed. The McDonald commercials are based on the same ideas as the H. R. PufnStuf series. The expression of that idea is sufficiently similar so that a jury applying an intrinsic test could find infringement. This is especially true here since there was strong evidence of access.
 
 SNEED, Circuit Judge:
 
 103
 I concur in the preceding portion of this opinion. The following portion, dealing with the problems of alternative or cumulative recovery and "in lieu" damages, expresses the majority view of this court on these two issues, and is intended to complement the preceding portion of this opinion.
 
 I.
 
 104
 Alternative or Cumulative Recovery.
 
 
 105
 If defendants can render an accounting of their profits, the question remains whether plaintiffs are entitled either to (1) the greater of either damages or profits, or (2) both damages and profits. Courts have been unable to agree on this question.[1] This disagreement has its roots in the conflict between the statutory language, which appears to contemplate a cumulative recovery,[2] and the legislative history, which indicates that Congress envisioned an alternative recovery.[3] This circuit in Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354 (9th Cir. 1947) expressly adopted the alternative recovery, and we are constrained to follow that decision here.
 
 
 106
 It has been argued that the Supreme Court's decision in F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952) and this court's interpretation of that decision in Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc., 367 F.2d 236 (9th Cir. 1966) overruled, sub silentio, Universal Pictures. We disagree. Both Woolworth and Shapiro dealt with the related question of the propriety of "in lieu" damages in certain factual situations; neither squarely confronted the question of cumulative versus alternative recovery.
 
 
 107
 To illustrate, in Woolworth the district court had awarded "in lieu" damages in the face of ascertained, albeit small, profits and substantial but unproven damages. The Supreme Court affirmed this award for two reasons: (1) to compensate the copyright owner for injury when proof of such injury is difficult or impossible, and (2) to discourage wrongful conduct. In the context of this holding the Court used the following language, which it has been argued, demonstrates that it favors cumulative recovery.
 
 
 108
 (A) rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.
 
 
 109
 344 U.S. at 233, 73 S.Ct. at 225.
 
 
 110
 When read in light of the issue before the Court, viz. the propriety of "in lieu" damages, this passage does not indicate that cumulative recovery is required to discourage infringement, but rather that the threat of "in lieu" damages should exist to serve as a deterrent to future infringement. The remainder of the quoted passage further evidences the thrust of the Court's opinion.
 
 
 111
 The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within the statutory limits to sanction and vindicate the statutory policy.
 
 
 112
 Id.
 
 
 113
 The fact that "a rule of liability which merely takes away the profits" is an insufficient deterrent helped to convince the Court to hold that "in lieu" recovery, not cumulative recovery, was available.
 
 
 114
 Nor does Shapiro hold that cumulative recovery is available under the Act. In Shapiro, the trial court had determined that, although ascertainable, damages were non-existent and profits were de minimus and consequently, the copyright owner was entitled to no monetary recovery. The Ninth Circuit affirmed these findings of fact and, reasoning from Woolworth, held that although the trial court had the discretion to apply "in lieu" damages, its refusal to do so was not error.
 
 
 115
 The trial court, relying on Sheldon v. Metro-Goldwyn Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), had concluded that if either profits or damages are ascertainable, then "in lieu" damages are inappropriate. We disagreed with that conclusion. In passing we stated that
 
 
 116
 since the opinion in Woolworth, Sheldon does not stand for the proposition that where both profits and damages can be ascertained the court should award the higher but not both and should decline to resort to the "in lieu" provision.
 
 
 117
 367 F.2d at 240.
 
 
 118
 This statement merely acknowledges the Woolworth dicta which indicates that the trial court has discretion to award "in lieu" damages even though both profits and damages have been proved. Again, we must note that this court was dealing not with the propriety of cumulative versus alternative recovery, but rather with the availability of "in lieu" damages. The question of whether only the higher of the two ascertainable elements may be awarded was not before the court; the court simply held that even with ascertainable profits and damages, "in lieu" damages still may be granted.[4]
 
 II.
 
 119
 Statutory "In Lieu" Damages.
 
 
 120
 In the case now before us the district court, after the jury had been dismissed, refused to exercise its discretion to hear additional testimony on the applicability of "in lieu" damages. It ruled that "in lieu" damages should have been submitted previously to the jury and consequently it declined to consider the propriety of such an award. We reverse this determination and hold that, after the plaintiffs have had an opportunity to prove profits, the district court should consider the propriety of "in lieu" damages, although an award of such damages will be within its discretion.
 
 
 121
 We so hold because the issue of "in lieu" damages is properly addressed to the court, not the jury. Section 101(b) expressly directs the court to use its discretion in the determination of "in lieu" damages.[5] The jury plays no role in this determination, because "the court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement, and the like, is made the measure of the damages to be paid . . . ." Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 106, 39 S.Ct. 194, 196, 63 L.Ed. 499 (1919) (emphasis added). See F. W. Woolworth Co. v. Contemporary Arts, Inc., supra.
 
 
 122
 The precise scope of the district court's discretion in awarding "in lieu" damages presents a more difficult question. Although in all cases the amount of "in lieu" damages is left to the discretion of the district court, limited in certain circumstances by the maximum and minimum amounts prescribed by the Act, the circumstances, if any, under which such an award must be made can be discerned only after properly interpreting F. W. Woolworth Co. v. Contemporary Arts, Inc. and Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.
 
 
 123
 Woolworth, strictly read, teaches us that when only profits are proven the district court has the discretion to award "in lieu" damages. The Supreme Court, however, indicated that "in lieu" damages also could be awarded when only actual damages were proven: "Lack of adequate proof on either element would warrant resort to the statute in the discretion of the court, subject always to the statutory limitations."[6] F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. at 233, 73 S.Ct. at 225 (Emphasis added).
 
 
 124
 It has been suggested that Shapiro teaches that if either profits or actual damages are not ascertained the district court must award "in lieu" damages. See, e. g., 2 M. Nimmer § 154.13 at 681, n. 91a (June 1976 Supp. at 77-78). We disagree. Shapiro was a case in which both actual damages and profits were ascertained. Under these circumstances the district court declined to award "in lieu" damages. This court affirmed the findings of fact but held, nonetheless, that the trial court in its discretion could award "in lieu" damages but was under no duty to do so.
 
 
 125
 Those who read Shapiro to impose a duty to award "in lieu" damages if either profits or actual damages are unascertainable point to dicta that states that "the judicial discretion . . . only comes into play when profits and damages have actually been proved, and unless they have, the court must apply the statutory standard." 367 F.2d at 240. We read this to mean that the district court has a duty to award "in lieu" damages only when both profits and damages have not been established. Three considerations support this interpretation. First, the cases cited immediately after the above quoted dicta, i. e., Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862 (1935); Jewell-LaSalle Realty Co. v. Buck, 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978 (1931); Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499 (1919), all involved fact situations in which neither damages nor profits were proven. With this in mind, it is clear why the court said immediately following the citations that Woolworth did not conflict with these cases. Second, a contrary interpretation of Shapiro would place it in direct conflict with the holding of Woolworth. Faced with ascertained profits, but unascertained damages, the Court nevertheless held that "in lieu" damages were discretionary. Third, inasmuch as Shapiro was decided in the context of ascertained profits and ascertained damages, it is not unreasonable to assume that the court was addressing situations in which either both profits and damages are ascertained or neither is ascertained.
 
 
 126
 This interpretation of Shapiro leaves the problem of "in lieu" damages in the following posture. If either profits or actual damages or both are ascertained, the court, in its discretion, may award statutory "in lieu" damages.[7] If neither profits nor actual damages are ascertained, then under the dicta of Shapiro the award of statutory "in lieu" damages is mandatory, although the amount of such recovery remains discretionary.
 
 
 127
 The foregoing interpretation of Woolworth and Shapiro provide the rules by which the trial court will be guided in respect to "in lieu" damages on remand of this case. On remand the trial court's first task is to determine, if possible, the profits of the infringers. If these profits are ascertainable, then plaintiffs are entitled to the larger of either the profits or damages, unless the district court, in its discretion, awards the statutory "in lieu" damages. If the profits are not ascertainable, then plaintiffs are entitled to the compensatory damages as found by the jury, unless the district court awards the discretionary "in lieu" damages.
 
 III.
 
 128
 Conclusion.
 
 
 129
 In view of the holdings set forth in both portions of this opinion the judgment of the district court finding infringement is affirmed. The district court's denial of plaintiffs' motion for an accounting is reversed. The case is remanded for an accounting, after which the district court may, in its discretion, award statutory "in lieu" damages.
 
 
 130
 Affirmed in part and Reversed in part.
 
 
 131
 JAMES M. CARTER, Circuit Judge, concurring and dissenting.
 
 
 132
 I concur in that portion of Judge Sneed's Opinion dealing with statutory "in lieu" damages. However, I am convinced that the Copyright Act contemplates cumulative recovery of both damages and profits, and therefore dissent from that portion of the Majority Opinion dealing with this issue.
 
 
 133
 The statutory language of Section 101(b) provides for recovery of "such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement . . . ." Thus, the statute itself provides for cumulative recovery of both damages and profits. However, considerable confusion was engendered by the House Report on the 1909 Act which indicated that recovery was to be in the alternative, as under the Patent Law.[1] This led Courts in several early decisions to rule that recovery was either of damages or profits. See Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 400-01, 60 S.Ct. 681, 84 L.Ed. 825 (1940); Gordon v. Weir, 111 F.Supp. 117, 123 (E.D.Mich.1953), aff'd, 216 F.2d 508 (6 Cir. 1954); Lundberg v. Welles, 93 F.Supp. 359, 361 (S.D.N.Y.1950); Orgel v. Clark Boardman Co., Ltd., 128 U.S.P.Q. 531, 532 (S.D.N.Y.1960), modified, 301 F.2d 119 (2 Cir. 1962). See generally Note, Monetary Recovery for Copyright Infringement, 67 Harv.L.Rev. 1044, 1051 (1954). This court adopted the alternative recovery rule in the early case of Universal Pictures Co. v. Harold Lloyd Corp., supra, 162 F.2d at 376, which the majority believes still controls. More recent decisions have without exception favored cumulative recovery, however. See F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952); Thomas Wilson & Co. v. Irving J. Dorfman Co., 433 F.2d 409, 413 (2 Cir. 1970); Alouf v. Expansion Products, Inc., 417 F.2d 767, 768 (2 Cir. 1969); Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc., 329 F.2d 194, 196 (2 Cir. 1964); Baldwin Cooke Co. v. Keith Clark, Inc., 420 F.Supp. 404, 405-06 (N.D.Ill.1976); L. L. White Metal Casting Corp. v. Joseph, supra, 387 F.Supp. at 1357; Fedtro, Inc. v. Kravex Manufacturing Corp., 313 F.Supp. 990, 995 (E.D.N.Y.1970); Ziegelheim v. Flohr, 119 F.Supp. 324, 329 (E.D.N.Y.1954); Trebonik v. Grossman Music Corp., 163 U.S.P.Q. 352, 361-62 (N.D.Ohio 1969); Gelles-Widmer Co. v. Milton Bradley Co., 132 U.S.P.Q. 30, 35 (N.D.Ill.1961), aff'd, 313 F.2d 143 (7 Cir. 1963).[2]
 
 
 134
 In the Woolworth case the lower court had awarded statutory "in lieu" damages and attorneys' fees for infringement of a statute. The Supreme Court found that there had been an adequate showing of profits by the infringer to enable assessment of that liability. "As to the other ingredient in computing liability, damages suffered by the copyright proprietor, the record is inadequate to establish an actually sustained amount." 344 U.S. at 230, 73 S.Ct. at 224. Nonetheless, the Court approved the "in lieu" damages award because cumulative recovery is provided by the Copyright Act. Thus the Court stated:
 
 
 135
 "(A) rule of liability which merely takes away profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." 344 U.S. at 233, 73 S.Ct. at 225.
 
 
 136
 The majority argues that Woolworth should not be viewed as controlling precedent in this case because it did not specifically deal with the issue of cumulative or alternative recovery. But the above-quoted language indicates that the Court believed that recovery of more than just profit is necessary. While in that case, damages could not be ascertained so that "in lieu" damages were appropriate, the conclusion is inescapable that where damages can be ascertained, they must be awarded in addition to profits in order to obtain the deterrent effect sought by the Court. As the Supreme Court recognized, the damage provision of the Copyright Act aims at more than just compensation of the copyright owner. It also served to prevent unjust enrichment by the infringer and to deter infringement. I agree with the Second Circuit that fulfillment of these purposes requires cumulative recovery. See Thomas Wilson & Co. v. Irving J. Dorfman Co., supra, 433 F.2d at 413-14; Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc., supra, 329 F.2d at 196. It follows that plaintiffs in this case should be entitled to recover both damages and profits, if the latter can be proven.
 
 
 137
 Universal Pictures Co. v. Harold Lloyd Corp., supra, was decided before the Woolworth case. It relied, instead, on Sheldon v. Metro Goldwyn Pictures Corp., 309 U.S. 390, 400, 60 S.Ct. 681, 84 L.Ed. 825 (1940) and Underwood Typewriter Co. v. E. C. Stearns & Co., 227 F. 74, 82 (2 Cir. 1915). This Court has already concluded that the Sheldon case was superseded by Woolworth. As the Court said in Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc., 367 F.2d 236, 240 (9 Cir. 1966):"The Sheldon case did make reference to and relied upon a report of the House Committee on the Copyright Act (309 U.S. at 400, 60 S.Ct. 681), which said that where both profits and damages had been ascertained the court could award the greater amount but not both. But that statement was superseded by the majority opinion in F. W. Woolworth Co. v. Contemporary Acts, 344 U.S. 228, 234, 73 S.Ct. 222, 97 L.Ed. 276 (1952). This distinguished the Sheldon case specifically, holding that the only question before the court in Sheldon had been apportionment of profits from an infringing motion picture, and that the case did not stand for the proposition that where profits were established the 'in lieu' provision did not come into play. Further support for the view that Sheldon does not stand for the point cited by the district court is the dissenting opinion in Woolworth which quotes the same provision from the House Committee report which was rejected in the majority opinion. We conclude that Sheldon is not authority for the rule stated in conclusion of law 4, and that, since the opinion in Woolworth, Sheldon does not stand for the proposition that where both profits and damages can be ascertained the court should award the higher but not both and should decline to resort to the 'in lieu' provision."
 
 
 138
 In Runge v. Lee, 161 U.S.P.Q. 770 (C.D.Cal.1969), aff'd 441 F.2d 579 (9 Cir.), cert. denied, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971), The jury returned a verdict in favor of plaintiff in a copyright infringement action and awarded plaintiff compensatory damages of $80,000. The district court later held an accounting of profits and determined that defendant's profits attributable to the infringement amounted to.$64,253. But the court awarded plaintiff only "the higher of the two" figures. 161 U.S.P.Q. at 772. Plaintiff, however, did not claim both damages and profits, and it is clear that neither the district court nor this court considered the damage issue.
 
 
 139
 It is significant that the Second Circuit also did not feel constrained by its early precedent establishing alternative recovery. Indeed, Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc., 329 F.2d 194 (2 Cir. 1964), which established the cumulative rule, did not even mention Underwood Typewriter. It seems clear that the Second Circuit concluded that Underwood Typewriter, like Sheldon, was no longer good law after Woolworth. I agree.
 
 
 140
 The cumulative recovery rule is supported by the recent general revision of the Copyright Act. Act of October 19, 1976, Publ.L.No.94-553, 90 Stat. 2541, amending 17 U.S.C. § 101 et seq. (1909). Section 504(b) thereof provides in part:
 
 
 141
 "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."
 
 
 142
 The new Act thus makes it explicit that the plaintiff is entitled to both actual damages and additional profits realized by the defendant from the infringement. See H.R.Rep.No.94-1476, 94th Cong., 2d Sess., at 161 (1976); S.Rep.No.94-473, 94th Cong., 1st Sess., at 143-44 (1976); U.S.Code Cong. & Admin.News 1976, p. 5659. This court should view this new Act as indicative of Congressional intent in this area, see N.L.R.B. v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), and follow the cumulative recovery rule.
 
 
 143
 GOODWIN, Circuit Judge, concurs in the Opinion by Judge Carter on infringement and concurs in the Opinion by Judge Sneed on damages.
 
 
 
 [1]
 The Kroffts are fifth generation puppeteers who have been in the entertainment industry in this country over 40 years. The evidence showed that they enjoyed years of success with their puppet shows in cities around the country most notably the Le Puppet de Paris adult puppet show. The Kroffts created the characters for "The Banana Splits," a popular children's television series produced by Hanna Barbera, before being asked to create their own show
 
 
 [2]
 On June 24, 1970, Needham made a presentation of a McDonaldland advertising campaign to McDonald's. Needham was awarded the account by a contract dated June 29, 1970. In July, three representatives of Needham came to the Kroffts' offices in Los Angeles to discuss the design and engineering work that would be required to produce the McDonaldland commercials. It is evident, therefore, that Needham was deceiving the Kroffts in their contacts after the June 29 contract
 
 
 [3]
 The evidence reveals that certain persons with whom plaintiffs dealt for licensing believed that the H. R. Pufnstuf characters were being licensed to McDonald's for use in their McDonaldland campaign. Accordingly, they did not pursue licensing arrangements for the characters themselves
 
 
 [4]
 The complaint also contained claims for relief in unfair competition, tortious interference, quasi-contract, and contract. The judgment and this appeal are based solely on the copyright claim
 
 
 [5]
 This is so because the prerequisites for copyright registration are minimal. The work offered for registration need not be new, but only original, i. e., the product of the registrant. Donald v. Uarco Business Forms, 478 F.2d 764, 765-66 (8 Cir. 1973); Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1109 (9 Cir. 1970). As stated in Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 102-03 (2 Cir. 1951):
 " 'Original' in reference to a copyright work means that the particular work 'owes its origin' to the 'author.' No large measure of novelty is required. * * * All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own" (citations omitted).
 Of course, the scope of protection against infringement is not necessarily coextensive with the scope of the copyright secured. See Puddu v. Buonamici Statuary, Inc., 450 F.2d 401, 402 (2 Cir. 1971).
 
 
 [6]
 The idea-expression dichotomy has been criticized by some commentators as outmoded because it was developed under older, narrower statutes which have since been considerably broadened. See, e. g., Collins, Some Obsolescent Doctrines of the Law of Copyright, 1 S.Cal.L.Rev. 127 (1928); Umbreit, A Consideration of Copyright, 87 U.Pa.L.Rev. 932 (1939); Note, Copyright Protection for Mass-Produced Commercial Products: A Review of the Developments Following Mazer v. Stein, 38 U.Chi.L.Rev. 807 (1971). Yet the distinction accurately conceptualizes the fundamental elements in an artistic creation and balances the competing interests inherent in the copyright law. We have surveyed the literature and have found that no better formulation has been devised. Moreover, most of these criticisms are directed at the fact that the courts tend to pay only lipservice to the idea-expression distinction without it being fairly descriptive of the results of modern cases. This is a criticism more of the application of the distinction than of the distinction itself, and can be alleviated by the courts being more deliberate in their consideration of this issue
 
 
 [7]
 The two-step approach of Arnstein does have its detractors. Judge Moore in a Second Circuit case described this approach as "merely an alternative way of formulating the issue of substantial certainty." Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1023 n.2 (2 Cir. 1966). But the approach certainly tends to decrease the importance of the trier of fact in the first step and increase this importance in the second step. See 2 Nimmer § 143.53 at 641-43. In this it represents a significant modification of the older audience test. Id. We do not resurrect the Arnstein approach today. Rather, we formulate an extrinsic-intrinsic test for infringement based on the idea-expression dichotomy. We believe that the Arnstein court was doing nearly the same thing. But the fact that it may not have been does not subtract from our analysis
 
 
 [8]
 McDonald's advertising campaign was divided into two distinct parts: its general audience advertising and its children advertising. The McDonaldland commercials were used exclusively on children's programming. The apparent success of this format is suggested by the fact that the McDonaldland commercials are still appearing on television over six years after their introduction
 
 
 [9]
 Even a dissection of the two works reveals their similarities. The "Living Island" locale of Pufnstuf and "McDonaldland" are both imaginary worlds inhabited by anthromorphic plants and animals and other fanciful creatures. The dominant topographical features of the locales are the same: trees, caves, a pond, a road, and a castle. Both works feature a forest with talking trees that have human faces and characteristics
 The characters are also similar. Both lands are governed by mayors who have disproportionately large round heads dominated by long wide mouths. They are assisted by "Keystone cop" characters. Both lands feature strikingly similar crazy scientists and a multi-armed evil creature.
 It seems clear that such similarities go beyond merely that of the idea into the area of expression. The use of the basic idea of the works does not inevitably result in such similarities. Certainly a jury applying an intrinsic test could find such similarities of expression substantial.
 
 
 [10]
 A description of the "what" and the "how" of a work serves as a useful tool in determining whether the expression of an idea differs from the idea itself. If, in describing how a work is expressed, the description differs little from a simple description of what the work is, then idea and expression coincide
 
 
 [11]
 We are not at all certain what defendants mean by distinguishing "things" from "dramatic works." They list statuettes, dolls, pictures, and jewelry as being "things." We assume this broad category would include fine paintings and sculpture, which surely are not "dramatic works." To suggest that such works must be identically copied to be infringed shows the spuriousness of the distinction. Moreover, defendants' cited cases do not lend any support to their contention. They find infringement where there have been identical copies made. This does not suggest that infringement would not have been found if only substantially similar copies were made
 
 
 [12]
 We also note that the jury was specifically instructed to consider the works as a whole. Instruction No. 17, requested by the defendants themselves, read:
 "In comparing the PUFNSTUF series and the McDonaldland commercials to determine whether there has been copyright infringement, you must consider and compare each of the works as a whole. That is, you must not simply focus on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein."
 This instruction properly warned the jury against analytic dissection in accordance with Arnstein and our opinion today.
 
 
 [13]
 One measure of infringement used in the past has been the effect of the allegedly infringing work on the value of the original. As this court said in Universal Pictures Co., Inc. v. Harold Lloyd Corp., 162 F.2d 354, 361 (9 Cir. 1947):
 "To constitute an invasion of copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute infringement."
 The record shows that the value of the H. R. Pufnstuf series, particularly as regards to its merchandising potential, was sizeably diminished after the McDonaldland commercials appeared. While we do not think that infringement should be so objectively measured, it is another indication of infringement here.
 
 
 [14]
 We note that this First Amendment argument was never raised in the court below and is asserted here for the first time. Plaintiffs suggest that it may not therefore be considered. See Frommhagen v. Klein, 456 F.2d 1391, 1395 (9 Cir. 1972); Simpson v. Union Oil Co., 411 F.2d 897, 900-01 (9 Cir.), rev'd on other grounds, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969). Since the asserted constitutional claims would affect not only the standard of review but our infringement tests, however, we exercise our discretion to consider the arguments. See Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)
 
 
 [15]
 In Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the court reasoned that in an economy based on free competition, the constitutionality authorized monopolies of patent and copyright must be strictly construed. It therefore found invalid state doctrines of unfair competition which expanded these monopolies. The court's concern was with monopolies as commercial, not political, impediments, and thus it did not reach first amendment considerations. See also Lee v. Runge, 404 U.S. 887, 892-93, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971) (Douglas, J., dissenting)
 
 
 [16]
 This exception to the rule that first amendment considerations do not operate to limit copyright protection was suggested by Professor Nimmer. Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?, 17 U.C.L.A.L.Rev. 1180, 1199 (1970). He suggests a system of compulsory licensing for "news photographs," which he defines as all products of the photographic and analogous processes (including motion pictures and video tape but excluding paintings, sculpture, and the like) depicting an event which was the subject of news stories appearing in the press. He gives the photographs of the My Lai massacre as an example
 
 
 [17]
 In Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2 Cir. 1966), Howard Hughes attempted to enjoin Random House from publishing a biography of Hughes. The biography was based on information contained in a series of articles appearing in Look magazine over which Hughes (via Rosemont) held a copyright. Had the biography merely attempted to use the information in the articles we would agree with the Second Circuit's refusal to enjoin because such information represents the "idea" of a biography on Hughes. But the Random House biography copied verbatim almost 27% of one of the Look articles and 14% of all of the articles. Rosemont Enterprises, Inc. v. Random House, Inc., 256 F.Supp. 55, 61 (S.D.N.Y.1966). We believe this represents an unjustifiable appropriation of the expression of the idea, and hence disapprove of the result in Rosemont. Because there are available alternatives in the form of expressing any verbal ideas, first amendment considerations should not limit copyright protection in this area. We need not reach this precise issue today, however, since it is clear that neither the H. R. Pufnstuf series nor McDonaldland commercials are newsworthy
 
 
 [18]
 Later, while discussing a proposed jury instruction, counsel for defendants commented:
 "(T)o say that the jury could consider the profits of McDonald's corporation as an element of damages here I think would be totally improper, and the same with Needham, Harper & Steers."
 We do not believe that defendants should now be permitted to ignore the difference between damages and profits when they clearly recognized this difference during trial.
 
 
 [19]
 While discussing proposed jury instruction No. 26, the following colloquy took place:
 "THE COURT: 'It is agreed, insofar as instruction No. 26, that the profits '
 "MR. BERMAN (Counsel for plaintiffs): 'I beg your pardon, sir?'
 "THE COURT: 'Let's return to 26.'
 "MR. BERMAN: 'Yes.'
 "THE COURT: 'It is agreed that the profits of the defendants are not to be considered by the jury in determining the plaintiffs' money-damages claim?'
 "MR. BERMAN: 'It's our position that's a question for the Court if a favorable verdict on the infringement claim is returned.'
 "THE COURT: 'Mr. Liebig.'
 "MR. LIEBIG (counsel for defendants): 'Well, the problem, of course, in that thing, I want to discuss it with the Court. In the ordinary context of the copyright case, of course, the defendant, infringer, publishes a book, and either he makes money or he doesn't make money selling that book. Now, in that sort of a situation profits are allowable. Now, I would suppose that the rule would be translated into this case if somehow you could identify a profit with an infringement, but to say that the jury could consider the profits of McDonald's corporation as an element of damages here I think would be totally improper, and the same with Needham, Harper & Steers. You get into the area of corporate profits, the let's see, that's '
 "THE COURT: 'Let's proceed. 27.' "
 
 
 [20]
 This same distinction is recognized in patent cases. For example, in Atlas-Pacific Engineering Co. v. Ashlock, 339 F.2d 288, 290 (9 Cir. 1964), cert. denied, 382 U.S. 842, 86 S.Ct. 55, 15 L.Ed.2d 83 (1965), this court recognized:
 "(T)here is a variety of possible elements of damages for patent infringement, such as the profits made by the infringer, the actual damage to the patentee . . . or a reasonable royalty . . . ."
 
 
 [21]
 Defendants contend, for example, that an Exhibit No. 52 was submitted listing all of Needham's commissions derived from production of the McDonaldland commercials from 1971 to 1973. No such exhibit appears in the record. A document numbered 112 contains this information but was not offered or received in evidence. What attention plaintiffs brought to the commissions of Needham arose from the claim for breach of contract, not copyright infringement. And certainly nothing was ever said or submitted regarding the amount of McDonald's profits
 
 
 [22]
 The Court in Dairy Queen did make an exception to its right to jury rule, where "the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." 369 U.S. at 478, 82 S.Ct. at 900. Plaintiffs claim that the complex nature of the accounting process in this case bars jury consideration under this reasoning. We disagree. The mere fact that corporate profits are so indirectly related to the infringement as to make an accounting impossible does not make the case complicated. As the Supreme Court noted, it will be a "rare case" where a jury could not adequately handle the issue. Id. This is not such a case
 
 
 [1]
 Compare Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354 (9th Cir. 1947) and Gordon v. Weir, 111 F.Supp. 117 (E.D.Mich.1953) aff'd 216 F.2d 508 (6th Cir. 1954) with Thomas Wilson & Co. v. Irving J. Dorfman Co., 433 F.2d 409 (2d Cir. 1970), cert. denied, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971) and Gelles-Widmer Co. v. Milton Bradley Co., 132 U.S.P.Q. 30 (N.D.Ill.1961), aff'd, 313 F.2d 143 (7th Cir.), cert. denied, 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963)
 
 
 [2]
 The Act provides that an infringer shall be liable for "such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement . . . ." 17 U.S.C. § 101(b)
 
 
 [3]
 H.R.Rep.No.2222, 60th Cong., 2d Sess. 15 (1909) states:
 The provision that the copyright proprietor may have such damages as well as the profits which the infringer shall have made is substantially the same provision found in section 4921 of the Revised Statutes relating to remedies for the infringement of patents. The courts have usually construed that to mean that the owner of the patent might have one or the other, whichever was the greater. As such a provision was found both in the trademark and patent laws, the committee felt that it might be properly included in the copyright laws.
 
 
 [4]
 In addition, subsequent to Shapiro, this circuit affirmed an award of only the larger of damages and profits. Runge v. Lee, 441 F.2d 579 (9th Cir.), cert. denied, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971). In Runge, the trial court elected to award compensatory damages in the amount of $80,000.00 instead of the profits of the infringer which amounted to $64,253.00. This court held that such an election was within the trial court's discretion, citing Universal Pictures, with no mention of Shapiro
 
 
 [5]
 Section 101(b) of 17 U.S.C. states in part:
 (O)r in lieu of actual damages and profits, such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts hereinafter stated . . . and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. . . . But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under the law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him. . . . "
 
 
 [6]
 The Court in Woolworth also noted that the district court has the discretion to award "in lieu" damages when both profits and actual damages have been proved
 (T)he statute has been interpreted to vest in the trial court broad discretion to determine whether it is more just to allow a recovery based on calculation of actual damages and profits, as found from evidence, or one based on a necessarily somewhat arbitrary estimate within the limits permitted by the Act.
 344 U.S. at 231-32, 73 S.Ct. at 224.
 
 
 [7]
 We assume that any such award of "in lieu" damages would exceed the amount of any ascertained damages or profits. Under no circumstances can an award of "in lieu" damages less than the amount of the ascertained damages or profits deprive the aggrieved party of his right to the greater of damages or profits, when both are ascertained, or the greater damages or profits, when only one is ascertained. In brief, an award of "in lieu" damages can only benefit, but not hurt, the aggrieved party
 
 
 [1]
 "The provision that the copyright proprietor may have such damages as well as the profits which the infringer shall have made is substantially the same provision found in section 4921 of the Revised Statutes relating to remedies for the infringement of patents. The courts have usually construed that to mean that the owner of the patent might have one or the other, whichever was the greater. As such a provision was found both in the trademark and patent laws, the committee felt that it might be properly included in the copyright laws."
 Id. at 15. I do not believe that resort to the legislative history of the 1909 Copyright Act is necessary. The language of the statute itself is plain. It is a well-established rule of statutory construction that where the language of a statute itself is clear and unambiguous, it is determinative of construction. Monte Vista Lodge v. Guardian Life Ins. Co. of America, 384 F.2d 126, 128 (9 Cir. 1967); 2A C. Sands, Statutes and Statutory Construction §§ 45.02, 46.04 at 4, 54 (Rev.ed.1973). The legislative history does not resolve ambiguity; it creates it.
 
 
 [2]
 Commentators generally endorse the cumulative over alternative recovery. See, e. g., L. Ambur, Copyright Law and Practice 1117 (1936); A. Weil, Copyright Law 467 (1917); Price, Monetary Remedies Under the United States Copyright Code, 27 Ford.L.Rev. 555, 564 (1959); Note, Remedies for Copyright Infringement, 23 Ark.L.Rev. 464, 466 (1969); Note, Monetary Recovery Under the Copyright, Patent, and Trademark Acts, 45 Texas L.Rev. 953, 962 (1967). But cf. 2 Nimmer § 151 at 667-69; Caplan, The Measure of Recovery in Actions for the Infringement of Copyright, 37 Mich.L.Rev. 564, 586 (1939); Comment, A New Look at Section 101(b) of the Copyright Act, 32 U.Chi.L.Rev. 98, 107-09 (1969)